Daniel DRASNER and Patricia W. Drasner, Plaintiffs,

v.

THOMSON McKINNON SECURITIES, INC., Defendant.

No. 75 Civ. 6048 (MP).

United States District Court, S. D. New York.

June 6, 1977.

488

Tolins & Lowenfels by Roger Tolins and Lewis D. Lowenfels, New York City, of counsel and Walter, Conston, Schurtman & Gumpel by William Schurtman and Alan Kanzer, New York City, of counsel, for plaintiffs.

Hall, McNicol, Hamilton & Clark by Donald G. McCabe, Donald E. McNicol, William T. Collins, III, Elaine M. Postley and William C. Bieluch, Jr., New York City, of counsel, for defendant.

POLLACK, District Judge.

This case is before the Court after a trial before a jury which rendered a verdict for plaintiffs. The defendant presented motions herein during trial and again after verdict to dismiss the complaint, to set aside the verdict which the jury returned responding to special questions put to it, for a directed verdict in defendant's favor on the complaint and on defendant's counter-claim or in the alternative for a new trial. The defendant is entitled to relief to the extent hereafter indicated.

Plaintiffs, husband and wife (Drasners), were experienced traders in the stock and commodity markets having had a number of accounts with brokers over a period of 20 years. They became margin account customers of defendant (Thomson) in 1973 opening an account in each of their names and in joint name. Before transacting business through Thomson, the Drasners had engaged in writing options through Put and Call brokers in the Over-The-Counter market. With the advent in 1973 of the Chicago Board of Options Exchange (CBOE), a national exchange, the Drasners started to sell options listed on the CBOE on orders placed with brokerage houses. These apparently were options sold on stock which the Drasners owned at the time, known as covered options.

In about February 1974 the Drasners decided to engage in the sale of naked options (on stock which they did not own at the time) apparently with the realization that they could cover the calls sold by them by purchases of equivalent options on the CBOE before maturity of the calls they had sold and thus limit any impending losses on the calls they had written.

Their sales of naked calls proved profitable in 1974. They wrote about 50 calls per month receiving the premiums payable to them therefor and realized about $65,000. in profits that year. The course of prices of stocks on which they sold calls was downward during 1974 resulting in minimal or no exercise of the calls by the purchasers.

In 1975 the Drasners were not so fortunate. They continued selling naked calls on highly volatile listed stocks traded on the New York Stock Exchange but market prices spiked sharply upward making the

calls written by the Drasners attractive to the purchasers. The exercise thereof would require delivery by the Drasners of stock at the call prices and below the market prices. A substantial loss on the options written by the Drasners kept building up between January and May 1975.

Thomson closed out the Drasner accounts on May 9, 1975 with the result that after the collateral posted in the accounts was liquidated and the outstanding calls were bought in there was a total deficit in the three accounts of $79,578.47.

This action was thereafter brought by the Drasners against Thomson seeking to disavow all of the calls that the Drasners had written between January and May 1975 on the ground that in violation of Regulation T issued by the Federal Reserve Board the defendant had failed to require the Drasners to deposit initial margin in their accounts allegedly obligatory under Regulation T, 12 C.F.R. § 220.1 et seq.

A jury has awarded the plaintiffs a damage verdict representing the market value of plaintiffs' collateral in their accounts in 1975 as well as the highest value the securities attained within 30 days after their accounts were closed out on the theory that such collateral was converted by defendant by the close-out and has denied the defendant a recovery of the deficit in the accounts following the close-out thereof.

The plaintiffs cast their claims in a number of different Counts. All Counts other than those to be specifically mentioned hereafter were dismissed either on consent or by the Court's action. The remaining Counts seek damages for violation of Regulation T (Count One), rescission of the option transactions for violation of Regulation T (Count Three), damages for violation of section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b5, promulgated thereunder (Count Nine), damages for violation of New York General Business Law § 352C (Count Ten), damages for common law fraud (Count Eleven), and damages for conversion of collateral on hand on May 9, and May 12, 1975 (Count Seventeen).

The defendant's motions essentially assert that the Court lacks jurisdiction of the plaintiffs' claims under Regulation T inasmuch as Regulation T did not govern the writing of naked options prior to January 1, 1977; that there is no private right of action for a violation of Regulation T; that Regulation X, 12 C.F.R. Part 224, bars any recovery under Regulation T by these plaintiffs; that plaintiffs have failed to establish a claim under the Securities Exchange Act of 1934 having failed to prove fraud as required under § 10(b), 15 U.S.C. § 78j(b), and that the Court lacks jurisdiction of the pendent common law claims.

Alternatively, the defendant seeks a new trial on the grounds that the verdict is against the weight of the evidence, is not in accordance with the law; and includes profits on transactions which have been disclaimed by the plaintiffs. Furthermore, allegedly as a matter of law, the defendant asserts that the jury erred in denying the defendants' counterclaims.

I.

*Fair Trial*

■ The defendant complains, properly, that the trial was prejudicially marred by unwarranted inflammatory conduct on the part and on behalf of the plaintiffs which was persistent throughout and was calculated to and did divert the minds of the jury from the issues in the claims on trial, and thereby resulted in a trial of a party to the litigation, rather than a trial of the claims in suit.

The plaintiffs were the main witnesses on their own behalf. Their schooled histrionics, affected ignorance of matters on which they possessed virtually expert knowledge, their dramatizations and theatrical displays on the witness stand went beyond mere matter bearing on credibility. These were skillfully culminated in a highly inflammatory summation to the jury that defendant was in effect conducting a bucket shop where the customers had no chance, that the option transactions were "fixed gambling" and the customers were bound to

lose their money. Counsel portrayed the incidents pertaining to alleged undelivered margin calls and the broken promise to give time and indulgence for deposit of the needed margin in May 1975 as conduct in line with stock option trading encouraged by defendant that was "fixed," analogous to "a fixed football pool" and a "fixed race track" resulting in "losses because the gambling was fixed."

The issues in this case were thus improperly expanded by plaintiffs to include matters which were not properly before the jury and which seriously prejudiced the defendant's right to a fair trial. The counsel's summation clearly sought to arouse undue passion and prejudice and exceeded the bounds of propriety to a degree to which objection would have been futile and exception unavailing and thus unnecessary.

The jury was helpless against the battering assault to perpetuate in their minds a notion that the complexity of the formula for computing margin requirements and the definitions posed by the plaintiffs somehow provided an excuse to plaintiffs from the results of the unprofitable calls on volatile stocks which they sold in 1975 in a market of rising stock prices.

Trial conduct similar in purpose and effect has been held grounds for ordering a new trial. *Koufakis v. Carvel*, 425 F.2d 892, 904 (2d Cir. 1970). *See also, N.Y. Central R.R. Co. v. Johnson*, 279 U.S. 310, 49 S.Ct. 300, 73 L.Ed. 706 (1929); 78 A.L.R. 1458, 1474, 1478.

Thus, in *Secor v. Heyman*, 123 Misc. 168, 205 N.Y.S. 348 (1st Dep't 1924), where a stock brokerage firm sued its customer to recover the price of stock purchased on his behalf, the Court ordered a new trial because the defendant's counsel in summation stated:

"There is many a man sitting on the benches in the park because he lost his money down on Wall Street."

Similarly, in *Coleman v. Miller*, 19 S.W.2d 829 (Ct. of Civil Appeals of Texas, 1929), a new trial was granted, in part because counsel made the following argument:

"The plaintiff . . . has been referred to as a stock salesman. . . . [He] did not sell any stock but sat in a swivel chair while other men sold the stock . . . . He is not a stock salesman but is a kid-glove, patent leather, spat-wearing parasite." *Id.* at 839.

In *Koufakis, supra*, an action by a dealer against the franchisor for breach of the franchise agreement, a new trial was ordered where the dealer's counsel alluded to the *Mafia* in characterizing the head of the franchise organization.

In *Laughing v. Utica Steam Engine and Boiler Works*, 16 A.D.2d 294, 228 N.Y.S.2d 44 (4th Dep't 1962), a personal injury action, a new trial was ordered, in part because counsel characterized the opposing party as follows:

"the best I can say of their clients is they are not entitled to be represented by such fine, upstanding men."

In *Colorado Canal Co. v. Sims*, 82 S.W. 531 (Tex.Civ.App.1904), plaintiff's counsel's statement, in his closing argument, that he did not ask the jury to bring in a verdict against the defendant because it was an irrigation corporation, although such corporations had swindled everyone who did business with them, was held grounds for reversal.

The verdict in this case borders on a travesty on justice, reaches a seriously erroneous result on a variety of bases, was unfairly influenced by misconduct attributable to the plaintiffs and at all events is against the weight of credible evidence. The myriad details illustrating the foregoing need not be chronicled because a new trial is unnecessary as a matter of law on the issues relating to federal margin requirements. There is, in the Court's opinion a fundamental flaw in plaintiffs' Regulation T oriented claims herein * which

---

* The pre-trial stipulation of the parties which may be thought to express a construction of Regulation T or of its applicability is not controlling on the questions of law involved herein and moreover cannot ground the requisite federal jurisdiction to sustain the claims herein. *Estate of Sanford v. Commissioner of Internal Revenue*, 308 U.S. 39, 51, 60 S.Ct. 51, 84 L.Ed. 20 (1939).

makes it unnecessary to order a new trial as to such claims for a miscarriage of justice—a new trial which defendant would otherwise receive but for the insufficiency in law of the claims invoking Regulation T obligations or representations.

## II.

*The security involved herein*

To properly understand the argot in the industry it will be useful to cover some relevant definitions of terms and background information on matters encountered in this case.

The "writer" of an option is a person who, through his broker has sold an option on the Exchange and has thereby undertaken with the Clearing Corporation to deliver the underlying stock upon the timely assignment of an exercise notice to him against payment of the specified exercise price.

The buyer of the option pays and the writer receives an amount known as the "premium".

"Margin" is the amount which a customer pays when he uses a broker's credit to purchase a security. Margin is referred to in two separate categories. It may refer to an "initial" margin requirement at the time of purchase or short sale; or it may refer to a minimum requirement of margin to be maintained in the account, i. e., "maintenance margin." Regulation T of the Federal Reserve Board governs the amount of credit (if any) which may be initially extended by a broker at the time a customer enters into any securities transaction. Apart from Regulation T, the New York Stock Exchange sets minimum initial and maintenance margin requirements. Additionally, some brokerage firms require higher maintenance requirements than fixed by the Exchange.

A "debit balance" in an account represents money which the broker has loaned to the customer. In purchasing securities on margin, the customer must pay the amount of money, if any, required by Regulation T and the balance of the purchase price, if any, is loaned to the customer. In the case of an option, no loan is needed by or made to the writer-customer by his broker. The cost to the purchaser of an option (the premium) must be paid up in full by him at the time of the commitment; the purchase may not be margined. The option writer requires no financing from the broker when he sells the option; the premium paid by the purchaser for the option is credited to the account of the writer when collected through his broker.

The writer of an option binds himself contractually to the Clearing Corporation to deliver the underlying stock. The Clearing Corporation is the issuer of and obligor on every CBOE option and its aggregate obligations to holders of options are backed up by the aggregate contractual obligations which writers owe to the Clearing Corporation.

An option which is not hedged by a position in the underlying security (an uncovered option) exposes both the customer writing the option and the brokerage firm carrying the account to potential loss in the event the market price of the underlying security moves in an unfavorable direction. In the case of a call, the writer customer agrees to sell a security at a specified price (exercise price). The call is likely to be exercised if the market value of the underlying security rises above the specified price. In such case, the holder of the call will purchase the stock at the specified price. If the call is not hedged with an offsetting "long" position in the underlying security, the writer customer and the brokerage firm carrying the account are exposed to the extent of the difference between the two prices.

Because of this potential exposure, New York Stock Exchange Rule 431(d)(2) requires that unhedged call options must be margined in the writer's account as if they

had been exercised. A call written for a customer's account represents a potential "short" position and requires the same maintenance margin as a "short" position in a security—generally, 30 percent of the market value of the underlying security.

Margin requirements under the rules of the CBOE are different; they are based upon the market price of the options rather than on the price of the underlying stock. The CBOE margin rules give members the alternative of margining customer accounts either under the CBOE's rules or the manner established under the rules of the New York Stock Exchange.

CBOE options have a market price of their own, namely, the premium payable therefor, and that moves up or down on the CBOE in conjunction with price movements in the underlying stock. The margin required by the CBOE is 100% of the market value of the option or $250 per trading unit, whichever is greater. In addition, the option must be marked to the CBOE market on a daily basis.

Prior to the establishment of the CBOE, the writer of an option and the brokerage firm carrying the "short" option position were at the complete risk of the market during the life of the option. Before CBOE there was no way in which the liability could be removed from the writer unless the brokerage firm carrying his account was fortunate enough to find the current holder of the option and repurchase it. The writer, in most cases, simply waited for the call to expire or until it was exercised against him, at which time he assumed his loss. The only ways to limit the loss were to purchase an equivalent call option or assume a position in the security under option offsetting the "short" position that would result if and when the call was exercised.

The CBOE maintains a secondary market in listed call options. In the event the writer of a CBOE call wishes to remove his liability under the terms of the option, or in the event the writer customer fails to meet a margin call and the brokerage firm wishes to liquidate his position in the op-tion, this can be accomplished by buying-in an identical option in the secondary market and so closing the "short" option position. In other words, the same procedure is followed as in closing out a "short" position in the stock.

It is the CBOE Clearing Corp. to which an option holder looks for fulfillment of his option contract upon exercise. The Clearing Corp. looks, in turn, to the clearing members carrying short positions in the particular class of option exercised. If an exercise notice has been assigned to a broker he in turn assigns it to a customer's account by allocation on a "first in, first out" basis on the basis of random selection or by any other method that the CBOE has approved as being fair and equitable. Upon allocation of an Exercise Assignment Notice to a customer, the underlying stock must be immediately sold and delivered by the writer of the option for the exercise value of the option contract. This sale is recorded in the general (margin) account of the customer and is subject to the same margin procedures prescribed for any sale of stock in any of the accounts of the customer.

### III.

*Federal margin requirement on uncovered options*

■ As already indicated, this suit was brought on the claim of a federal private right of action arising from alleged violation of federal margin requirements for option writing during 1974 and 1975. However, effective January 1, 1977, the Governors of the Federal Reserve Board instituted, for the first time, a margin requirement on uncovered option writing, by amendment to Regulation T. Since none of the transactions in this case took place thereafter and all of the uncovered options sold by the plaintiffs were sold in 1974–75, there was no violation of Regulation T by the plaintiffs or defendant based on failure to comply with a federal margin rule.

The Federal Reserve Board on September 27, 1976, instituted the margin requirement

by an addition to Regulation T and made it effective January 1, 1977, following notice of proposed rule-making published three years earlier on May 23, 1973 at 38 Federal Register 13,571. The notice invited comment on a proposal to require a uniform deposit of margin by a broker's customer, in connection with the issuance, endorsement and guarantee of any put, call or combination thereof. As initially proposed the rule would have required a margin deposit on option transactions based upon the current minimum requirement of the major stock exchanges.

On August 20, 1975, a revision of the 1973 proposal was published by the Federal Reserve Board at 40 Federal Register 36,390 and further comments were invited. The revised proposal of August 1975, called for an initial margin requirement of 30 percent of the current market price of the underlying security for uncovered options; that, in fact, was the current minimum requirement of the major stock exchanges.

After reviewing the comments received and the evolving conditions in the options market, the Board determined on September 27, 1976 that it is in the public interest to adopt an amendment "instituting" a uniform margin requirement in connection with options writing.

Accordingly, the Board added a new section in 12 C.F.R. § 220.8 of Regulation T, viz. paragraph "(j)", which is contained in the Supplement to Regulation T, and provides as follows:

(j) *Margin required for the writing of options.* The amount to be included in the adjusted debit balance of a general account, special bond account or special convertible debt security account pursuant to paragraphs (d)(5) and (i) of Section 220.3 as the margin required for the issuance, endorsement or guarantee of any put or call shall be 30 percent of the current market value of the underlying security with an adjustment for any applicable increase or reduction.

Effective date. This amendment is effective January 1, 1977. By order of the Board of Governors, September 27, 1976. (41 Fed.Reg. 43,895, October 5, 1976).

Notwithstanding the clear statement by the Federal Reserve Board concerning this addition to Regulation T, "instituting" a margin requirement, it is plaintiffs' contention that a margin requirement pre-existed the 1976 addition thereof to Regulation T. Plaintiffs contend that such a requirement existed therein through incorporation by expressions contained in the regulation and by reference therein to the margin requirements of the stock and options exchanges and of the brokerage houses themselves and that such incorporation created federal margin rules which the parties violated in respect to the plaintiffs' accounts, albeit that plaintiffs' violation was unknowing, they say. Thus, plaintiffs spell out an alleged implied private federal right of action against defendant entitling plaintiffs to recover all their losses and/or to rescind and shift the risk of their transactions to the brokers.

## IV.

*There was no violation of Regulation T*

■ The jury was instructed that for its purposes it was to assume that under federal law the obligation to deliver stock called for by naked call options was to be margined as if the option had been exercised by its purchaser on the day the option was sold. It is this hypothesis, of course, which is at the bottom of the legal question to be decided on the motions to dismiss the suit.

A survey of the regulatory history and Board interpretations of what is now section 220.3(d)(5) of Regulation T confirms the inexistence in 1974 and 1975 of a federal obligation to deposit margin with a broker on each sale of an uncovered option on stock. Furthermore, as will be shown in Part V of this opinion no implied private federal right of action exists for breach of such an obligation, at any event.

Regulation T in a "general rule", § 220.-3(b), has provided, since 1938, that the adjusted debit balance of a general account shall not exceed the maximum loan value of the securities in the account. This means

that the amount of a customer's commitments for his account (his debit balance), may not exceed the maximum loan value of those commitments. To accomplish this, margin must be deposited so that the sum of the margin deposit and the loan value are equal to, at least, the amount of the commitments.

For calculating the adjusted debit balance Regulation T provided in § 220.3(d)(5) for the inclusion of

(5) The amounts of any margin required in connection with the issuance, endorsement, or guarantee of any put, call, or combination thereof.

The meaning of the phrase "any margin required" as used in § 220.3(d)(5) of Regulation T, quoted above, is disputed by the parties to this suit. Defendant contends that this subdivision of the Regulation merely expresses that a deposit, if made, by a customer in connection with writing an option, shall be reflected in the calculation of the adjusted debit balance of a general account, that is, such deposit if made must be considered as added to other loan values in an account (decreasing the adjusted debit balance of the account).

Defendant contends that the Federal Reserve Board's sole concern under § 220.-3(d)(5) was that any margin posted in connection with an options transaction should not be available as margin for other transactions of a more conventional nature, i.e., counted twice, and that this subsection, properly construed, achieves that purpose.

On the other hand, plaintiffs construe this subdivision as expressing an obligation of the option writer to furnish margin to a broker on the sale of an option, i.e., to debit the customer's account by the higher of (a) the amount of deposit required by the broker's own house rules, or (b) the amount of deposit required by the rules of the exchange on which the transaction took place or of which the broker was a member.

In sharp contrast to the Regulation's treatment of margin in the context of types of transactions other than options[1] there was nothing in the Regulation which either expressly, or by clear implication, elucidated the meaning of the phrase, "any margin required" in subdivision 5 of § 220.3(d) of Regulation T.

Analysis of the history of Regulation T and its interpretations by the Board shows that the defendant's construction rather than plaintiffs' correctly reflects the Board's intent.

From October 1, 1934, when Regulation T first became effective, until May 23, 1973, (except for a reference during 1934–38 to the broker's endorsement as "the creditors" endorsement rather than "his" endorsement), Regulation T mentioned options in connection with computing the adjusted debit balance in a customer's general account:

[T]he adjusted debit balance of a general account shall be calculated by taking the sum of the following items: . . . (5) the amount of any margin customarily required by the creditor in connection with his endorsement or guaranty of any put, call or other option.[2]

1. Thus, for example, during the times here relevant, § 220.8(d) provided that "[t]he amount to be included in the adjusted debit balance of a general account, pursuant to § 220.3(d)(3), as margin required for short sales of securities . . . shall be 50% of the current market value of each security."

   Most significantly of all, since January 1, 1977, Regulation T has provided that in connection with options transactions, "the margin required" is "30% of the current market value of the underlying security" plus or minus any differences between the current market value and the option exercise price.

2. From 1934 to 1938, the portion of Regulation T mentioning options was also somewhat long-

er than thereafter, though in substance the same, until the amendments in 1973, *see infra*:

   *Adjusted debit balance.*—For the purpose of this regulation, the adjusted debit balance of an account shall be calculated by taking the sum of the following items: . . . (4) The amount of any margin customarily required by the creditor on every future commitment in unissued securities, in commodities, or in foreign exchange, and/or in connection with the creditor's indorsement or guaranty of any put, call or other option, *plus* any unrealized loss on each such commitment and/or *minus* any unrealized gain on each such commitment not exceeding the margin thereon. . . .

The phrase "required by the creditor" [he is defined as a broker, Regulation T § 2b] implies that if any margin requirement was being imposed by incorporation, it was only the one arising from the broker's own house rules, rather than those of the exchanges. The term "customarily" would connote nothing more than that the broker should reflect in the adjusted debit balance the amount that *he* usually requires, whether or not this amount is up to the levels set by the exchanges.

The Board's early treatment of short sales also indicates that this language—"margin customarily required by the creditor" . . . was not intended to incorporate any standards into Regulation T, and does not require that any margin be posted, but simply describes what is to be done when such margin is provided.

In 1934, Regulation T used similar language for options and short sales, as follows:

§ 3(f) [The adjusted debit balance shall be calculated by taking the sum of]

    *     *     *     *     *     *

(3) The . . . margin customarily required by the [broker] on such [short sales];

(4) The amount of any margin customarily required by the [broker] . . . in connection with [his] endorsement or guarantee of any put, call, or other option.

In 1937, the provision of Regulation T dealing with short sales was amended to read in relevant part:

§ 3(f)(3) [With respect to short sales, the adjusted debit balance shall include] such amount as the Board shall prescribe . . . in the supplement to this regulation as the amount to be included as the margin required for such short sales.

Since 1937, the supplement has prescribed a definite percentage of the market value of the underlying stock as the amount to be included in the adjusted debit balance as the margin required for such short sales.

Significantly, in its 1937 Annual Report, the Federal Reserve Board made the following comments on the 1937 amendments with respect to short sales:

The provisions of the [Securities Exchange Act of 1934] . . . authorized *the establishment of margin requirements in connection with short sales which had not heretofore been prescribed.* . . . (emphasis added). (Id. at p. 208).

Since the Federal Reserve Board did not consider that the language used in connection with short sales—"margin customarily required by the creditor [i.e., broker]"—imposed any margin requirement under Regulation T, the same should be true for the identical language employed in connection with option transactions.

A Board interpretation directed in part to the meaning of subsection (d)(5), and appearing 36 years after the regulation was first promulgated,[3] supports defendant's view, or at the very least, fails to evidence the intent which plaintiffs would attribute to the Board:

(d) The stock exchanges require that the writer of an option deposit and maintain in his margin account with the indorser 30 percent of the current market price in the case of a call (unless he has a long position in the stock) and 25 percent in the case of a put (unless he has a short position in the stock). Many indorsing firms in fact require larger deposits. Under § 220.3(a) of Regulation T, all financial relations between a broker and his customer must be included in the customer's general account, unless specifically eligible for one of the special accounts authorized by § 220.4. Accordingly, the

---

**3.** Although plaintiffs have presented two letters which they claim support their "incorporation" theory, and which were written in 1966, and 1971, these letters are most inconclusive on the issue raised here, and in any event are irrelevant to the views of the Federal Reserve Board. As the 1971 letter states: "It should be recognized that the [statements in this letter] . . . are not representative of any official or unofficial position of the Board of Governors." Perhaps more importantly, these letters were not addressed to defendant herein, and thus it cannot be charged with knowledge of the contents of these private letters. *See infra.*

writer, as a customer of the member firm, must make a deposit, which is included in his general account.

(e) *In order to prevent the deposit from being available against other margin purchases, and in effect counted twice,* § 220.3(d)(5) requires that in computing the customer's adjusted debit balance, there shall be included "the amount of any margin customarily required by the creditor in connection with his endorsement or guarantee of any put, call, or other option". No other margin deposit is required in connection with a normal put or call option under Regulation T. 12 C.F.R. § 220.122, Feb. 21, 1970. (Emphasis added)

Of equal significance is the fact that although the question being dealt with in this interpretation was "whether . . . selling 'deep in the money put and call options' would involve an extension of credit for the purposes of the Board's regulations governing margin requirements for securities transactions," the Board's answer did not rely on subsection (d)(5) and did not state that a broker's endorsement of an option contract involves an extension of credit.[4]

The Board analyzed the "deep in the money" situation as an extension of credit by the writer of the option to the purchaser of the option. In instituting the margin requirement effective January 1, 1977, the Board followed the notion that when an option is written it is to be deemed also to have then been exercised and accordingly is an extension of credit by the broker to the writer (in a presently indeterminate amount). (The presently required margin is nonetheless the amount specified in the regulation).

In conclusion, it has not been demonstrated that for the 39 years during which § 220.3(d)(5) of Regulation T required that the general account be debited by the "amount of any margin customarily required by the creditor" in connection with options transactions, that the Federal Reserve Board intended thereby to impose as federal margin requirements those of the brokerage houses and stock exchanges.[5]

In any event, whatever the Board's intent was—as embodied in the foregoing provision—would seem to bear only slight relevance to this case, since on May 23, 1973, § 220.3(d)(5) was amended to read, as it did during all times relevant to this action, as follows:

[The adjusted debit balance shall include] [t]he amounts of any margin required in connection with the issuance, endorsement, or guarantee of any put, call, or combination thereof. 38 Fed.Reg. 13548–49, May 23, 1973.

On its face, this language is certainly ambiguous and at least as susceptible to the construction offered by defendant as to that offered by plaintiffs.[6] If the Board

---

4. An option is "deep in the money" if at the time it is written the exercise price is below the market price of the underlying stock. Endorsing or guaranteeing such a contract is thus an extension of credit by the broker in the amount of that difference and that credit would be subject to margin requirements. None of the Drasner options were written deep in the money.

5. Plaintiffs rely on an interpretation contained in 38 Fed.Reg. 12098, May 9, 1973 (12 C.F.R. § 220.128), as somehow sustaining their construction of this language. However, at the time this interpretation was issued, the matter considered in it—Treatment of simultaneous long and short positions in the same margin account when put or call options on such stock are also outstanding in the account—was not subject to exchange margin rules; NYSE Rule 431 did not then require margin on puts and calls when the writer was both long and short of the underlying stock. Thus that interpretation cannot sustain the argument that the Board was incorporating the exchange rules. Moreover, the interpretation was vague as to just what margin, if any, was required under Regulation T in connection with option writing. The relevant subsection, § 220.3(d)(5), was amended after the issuance of this interpretation and prior to the options here in suit.

6. It is quite clear that the Board was able to state "we incorporate the exchange rules" in the sense such a drafting technique had been employed in Regulation X in 1971, 12 C.F.R. § 224.1 *et seq.*: "Credit obtained from a broker/dealer shall conform to . . . Part 220 of this chapter (Reg. T), which is hereby *incorporated in this part.*" (emphasis added) § 224.-2(2).

had intended thereby to incorporate the margin requirements of the exchanges and brokerage houses, it would have been simple to so indicate by merely stating "the margin required by the exchange or brokerage house rules." On the other hand, if the Board only intended that the adjusted balance be debited by the amounts of margin actually posted—i. e., actually required by the creditor—then the language chosen seems adequate for such a purpose.

Nor is plaintiffs' position supported by examining the disputed provision in the context of the entire regulation. First, Regulation T does not even purport to incorporate extraneous standards as its margin requirements for other types of transactions. Instead, it sets out these margin requirements with mathematical precision. Second, § 7(e) is a part of the Regulation:

(e) *Additional requirements by exchanges and creditors.* Nothing in this part shall (1) prevent any exchange or national securities association from . . . requiring [its] members to secure or maintain higher margins or further restricting the amount of credit which may be extended or maintained by them, or (2) modify or restrict the right of any [broker] to require additional security for the maintenance of any credit [or] to refuse to extend credit. . . .

Moreover, the Board's statements contained in both the notice proposing the amendment and the one adopting it, fail to indicate in any way that Regulation T incorporated the margin requirements of the stock exchanges or brokerage houses with respect to options:

Clarifying changes are proposed in § 220.-3(d)(5) to indicate that *any margin required* in connection with the issuance, endorsement, or guarantee of any put, call, or combination thereof must be add-

ed to the adjusted debit balance. . . (emphasis added). 38 Fed.Reg. 5267, Feb. 27, 1973.

Indeed, in these notices the Board stated: These amendments . . . make it clear that the customer's adjusted debit balance . . . must include the amount of margin required in connection with the issuance, endorsement, or guarantee of any put, call or combination thereof whether or not such obligations are assumed by the creditor. 38 Fed.Reg. 13548, May 23, 1973.

Since the Board's power is limited to regulating extensions of credit, and since the only situation in which there is even an arguable extension of credit is where the broker does assume some obligation on behalf of the customer, it appears that the Board did not intend to impose any margin requirements under § 220.3(d)(5), as amended, but only sought to ensure that any deposits made in connection with an options transactions would not be available as margin for conventional securities transactions.[7]

That the Board did not intend to impose margin requirements with respect to options transactions during the times here relevant is further evidenced by the fact that the Board did propose during this period to amend Regulation T so as to "institute" a margin requirement.[8] 41 Fed.Reg. 43895, Oct. 5, 1976. Indeed, as previously stated, the first such proposal was that the Regulation T margin requirement "would be based, at the outset, upon the minimum margin requirements of the major stock exchanges for puts, calls and combinations thereof. 38 Fed.Reg. 13571, May 23, 1973.

The industry's response to these proposals similarly indicates that it was not understood that Regulation T incorporated the exchanges' margin rules with respect to options. Thus the American Stock Ex-

---

**7.** The Court recognizes that the broker may incur obligations on a Chicago Board of Options Exchange option without guaranteeing the option. Nonetheless, it is the assumption of an obligation by the broker which creates the arguable extension of credit in connection with the issuance of the option, and here the Board has stated that the balance of the account must be debited *whether or not the broker assumes obligations.*

**8.** Moreover, plaintiffs' argument that the Board only adopted the margin rules of January 1, 1977, governing options, in order to have uniformity, seems spurious.

change stated the following in its letter to the Board of January 5, 1976:

> [W]e seriously question the wisdom of incorporating in Regulation T margin requirements with respect to the sale of put and call options. [W]e do not believe such transactions involve the extension of credit. . . .
>
> \*     \*     \*     \*     \*     \*
>
> We . . . believe it appropriate for these requirements [relating to the sale of put and call options] to be established and *enforced* by self-regulatory organizations within the securities industry. (emphasis added).[9]

And the Chicago Board of Options Exchange stated the following in its letter to the Board of September 29, 1975:

> [W]e have concern as to whether it is appropriate under section 7 of the Exchange Act for the Board to prescribe margin for options transactions. The Board's authority under Section 7 pertains to regulating extensions of credit, but in the ordinary case options writing transactions do not involve the extension of credit by brokers to their customers. . . . [Nevertheless], we believe that the customer's debit balance should . . be adjusted, as it currently provided in Section 3(d)(5) of Regulation T, in order to assure that the deposits made by the customer . . . do not have the effect of reducing his Regulation T requirement. . . .

### V.

*No private right of action under Regulation T may be implied in this case*

■ It has not been demonstrated that it was the intent of the Federal Reserve Board, during the periods here relevant, to impose a margin requirement with respect to options transactions, whether by incorporating the standards of the exchanges and brokerage houses, or otherwise. This alone is a sufficient reason for holding that no

right of action under Regulation T can be maintained herein.

■ Extraneous sources cannot save the Regulation. Even if the Board had intended to impose margin requirements under subsection (d)(5) with respect to the writing of options, the Board's failure to adequately express that intent within the terms of the Regulation requires that no private right of action be allowed under this subsection.

In *Porter v. Block*, 156 F.2d 264 (4th Cir. 1946), in determining whether there had been a violation of administrative regulations so as to allow the recovery of a monetary penalty, the Court found the following language employed by the Supreme Court in connection with a criminal proceeding based upon administrative regulations to be pertinent:

> This delegation [of rule-making power to the administrative agency] to provide in detail against circumvention and evasion, as to which Congress has imposed criminal sanctions, creates a grave responsibility. In a very literal sense the liberties and fortunes of others may depend upon his definitions and specifications regarding evasion. Hence to these provisions must be applied the same strict rule of construction that is applied to statutes defining criminal action. In other words, the Administrator's provisions must be explicit and unambiguous . . . .
>
> \*     \*     \*     \*     \*     \*
>
> *Not even the Administrator's interpretations of his own regulations can cure an omission or add certainty and definiteness to otherwise vague language. The prohibited conduct must . . . be set forth with clarity in the regulations and orders which he is authorized by Congress to promulgate under the Act. Congress has warned the public to look to that source alone . . . .* (emphasis added) *Id.* at 270, *quoting M. Kraus & Bros. v. United States*, 327 U.S. 614, 621–22, 66 S.Ct. 705, 90 L.Ed. 894 (1946).

---

**9.** The focus on enforcement is crucial here. The only difference between the position advanced by plaintiffs, and that advocated by

defendant with respect to the meaning of subsection (d)(5) relates to enforcement.

Whatever doubt the Court might have about the applicability of this reasoning to a case involving a monetary penalty is laid to rest when it is borne in mind that violations of Regulation T provide the basis for a criminal prosecution, *see e. g., United States v. Weisscredit Banca Commerciale E D'investimenti,* 325 F.Supp. 1384 (S.D.N.Y. 1971), and that "there cannot be one construction for [agency actions] and another for the Department of Justice." *F. C. C. v. American Broadcasting Co.,* 347 U.S. 284, 296, 74 S.Ct. 593, 600, 98 L.Ed. 699 (1954).

■ It follows that in order for a private right of action to be maintained upon an alleged violation of Regulation T, the relevant provision of the regulation must be explicit as to its intendment. *See Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 375, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973).

■ There is no doubt that the language relevant to this action, § 220.3(d)(5) the regulation in effect in 1975 (in contrast with the Amendment effective January 1, 1977) is not explicit, but instead is vague and ambiguous if most favorably considered from plaintiffs' view. This precludes the implication of a private right of action for claimed violation of Regulation T. *Cf. Soglin v. Kauffman,* 418 F.2d 163, 168 (7th Cir. 1969).

When the question of implication of a private right of action is examined from the viewpoint of whether option writers were the intended beneficiaries of the legislation bottoming Regulation T and whether it was for their especial benefit that the statute

was enacted, there is yet another basis for holding that no private federal right of action is to be implied in these premises.

In *Pearlstein v. Scudder & German,* 429 F.2d 1136 (2d Cir. 1970), *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971), (*Pearlstein I* hereafter), it was held that a customer has an implied right of action against his broker for losses suffered in connection with violations of Regulation T. That holding is of doubtful viability in the light of a statute enacted thereafter by Congress and more recent case authorities.

*Pearlstein I* relied primarily on an enforcement rationale,[10] noting that the legislative history of Section 7 of the Securities Exchange Act of 1934, 15 U.S.C. § 78g, indicated that the main purpose of the legislation was the "protection of the overall economy from excessive speculation [and] that it has been recognized . . . that private actions . . . are a highly effective means of protecting the economy as a whole from margin violations by brokers and dealers." *Id.* at 1140.

*Pearlstein I* did note further, however, that the federally imposed margin requirements "forbid a broker to extend undue credit but do not forbid customers from accepting such credit [which indicated] that Congress has placed the responsibility for observing margins on the broker." *Id.* at 1141.

Subsequent to the decision in *Pearlstein I,* Congress added subsection (f), 15 U.S.C. § 78g(f),[11] to § 7 of the 1934 Exchange Act. [Oct. 26, 1970]. That imposes upon the customer responsibility for observance of the

---

**10.** The Court cited a Law Review Note, Federal Margin Requirements as a basis for Civil Liability, 66 Colum.L.Rev. 1462 (1966). This note covers two possible theories for implied causes of action for margin violations. The first is a tort theory based on section 286 of the Restatement of Torts, which allows implication if there is a specific legislative intent to protect the plaintiff or the class to which he belongs. The Note, at the pages cited in *Pearlstein,* concludes that Congress' intent under section 7 as shown by the legislative history of that section was not to protect individual investors, *see infra,* and that implication under a tort theory would thus be inappropriate. The second theory discussed by the Note is the enforcement

theory, to the effect that implication is proper where to do so would further the broad congressional goals of the statute whether or not there is a legislative intent to protect the class to which plaintiff belongs;

"[t]o the extent that private suits provide an additional sanction against violation of the margin provisions, they do help to effectuate the macro-economic policy [underlying those provisions]." *Id.* at 1475.

**11.** *See also,* Regulation X, 12 C.F.R. § 224.1 *et seq.,* implementing this statute. [Oct. 13, 1971].

margin requirements set out in Regulation T.

The impact of this recent legislation may well be that an implied private right of action may no longer be derived from Regulation T in every case.

As the Court stated in *Pearlstein v. Scudder & German*, 527 F.2d 1141, 1145 n.3 (2d Cir. 1975) (*Pearlstein II*):

"[T]he addition of section 7(f) to the Exchange Act . . . cast[s] doubt on the continued viability of the rationale of our prior holding." *Id. See also, Bell v. J. D. Winer & Co.*, 392 F.Supp. 646, 652–54 (S.D.N.Y.1975).

More recently, in *Utah State University v. Bear, Stearns & Co.*, 549 F.2d 164 (10th Cir. 1977), the Court went the whole way and held that no private right of action exists for violations of Regulation T.

In *Piper v. Chris-Craft*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), the Supreme Court indicated the circumstances under which a private right of action may be implied from statutes and regulations thereunder, that is:

"where congressional purposes are likely to be undermined absent private enforcement, private remedies may be implied *in favor of the particular class intended to be protected by the statute.*" (emphasis added). *Id.* at 25, 97 S.Ct. at 941.

The Supreme Court held in *Chris-Craft* that a defeated tender offeror does not have an implied right of action for damages under § 14(e) of the Securities Exchange Act of 1934; [12] that no implication of a private right of action would be made since plaintiff "is not an intended beneficiary of the . . . Act and surely is not one 'for whose *especial* benefit the statute was enacted.' [*Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975)]" *Id.* at 37, 97 S.Ct. at 947.

In the case of Section 7 of the Exchange Act, both the legislative history thereof,[13] and the addition of subsection (f) thereto, make it clear that although investors as such are mentioned by the legislation, all categories of investors in all types of situations are not necessarily the intended beneficiaries of the legislation; all are not necessarily the ones for whose *especial* benefit the statute was enacted.

The foregoing evolution of decisions indicates that all types of investors do not necessarily possess an implied private right of action against their brokers for Regulation T violations.

Even if the enforcement rationale of implied actions is still a sufficient ground for implication,

> The main purpose is to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry—to prevent a recurrence of the pre-cash situation where funds which would otherwise have been available at normal interest rates for uses of local commerce, industry and agriculture, were drained by far higher rates into security loans and the New York call market."

And, as the Note in 66 Colum.L.Rev. at 1470–71 concluded, after reviewing the entire legislative history of section 7:

> "In short, the margin provisions as finally enacted were designed solely to provide 'a supplementary instrument of credit policy—one of the means of making a broad credit and monetary policy effective.' Any protection of the small speculator from individual loss was merely consequential—a 'by-product.' "

---

12. The Supreme Court thus rejected as erroneous the following conclusion of the Court of Appeals that:

> "We can conceive of no more effective means of furthering the general objective of § 14(e) than to grant . . . standing to sue for damages . . . [p]articularly in light of the enforcement rationale . . . ." *Chris-Craft, supra,* at 16, 97 S.Ct. at 937, quoting from 480 F.2d 341, 361 (2d Cir. 1973).

13. The Report of the House Committee, H.R. Rep. No. 1383, 73rd Cong., 2d Sess. 8 (1934), stated:

> "The main purpose of these margin provisions . . . is not to increase the safety of security loans for lenders. Banks and brokers normally require sufficient collateral to make themselves safe without the help of law. Nor is the main purpose even protection of the small speculator by making it impossible for him to spread himself too thinly—although such a result will be achieved as a by-product of the main purpose.

"[not] every violation [of Reg. T] . . . should . . . result in . . . and a private claim for . . . relief." "These implied causes of action should be read in conjunction with the main purpose of Section 7 which is to protect the national economy, and should not be extended beyond the point where they support such purposes." *Newman v. Pershing*, 412 F.Supp. 463, 468, 469 (S.D.N.Y. 1975). *See also Bell v. J. D. Winer & Co., supra*, at 654.

In the circumstances of this case there is substantial reason why no implied right of action should be found.

■ During the times relevant herein, options transactions were not a significant factor in terms of the nation's allocation of credit resources; otherwise, the Federal Reserve Board would have established specific margin requirements in connection with such transactions.

Moreover, implication of a private right of action in respect to margin controversies in option transactions would not be a "necessary supplement" to administrative action. *Piper, supra*, 430 U.S. at 25, 97 S.Ct. 926.[14] Since brokers and customers have a duty to observe margin requirements, and since "the extent of an investor's knowledge of these [margin] rules [is] frequently difficult of tangible proof," *Pearlstein I, supra*, 429 F.2d at 1141, an implied private right of action would invite investors to induce or acquiesce in violations, and thus would not supplement administrative enforcement. "Even though the SEC operates in this context under . . . practical restraints . . ., institutional limitations alone do not lead to the conclusion that any party interested . . . should have a cause of action for damages . . . ." *Piper, supra*, 430 U.S. at 41, 97 S.Ct. at 949.

Even assuming that a broker has failed to comply with margin rules pertinent to option writing, administrative and perhaps even criminal sanctions provided by the 1934 Act would seem the appropriate relief rather than to permit the writer of the options to shift the risk of market decline or unwelcome appreciation as the case may be to the broker. The economic purpose behind Section 7 of the 1934 Act and Regulation T is not aimed at the protection of option speculators nor promulgated for their especial benefit. The purpose of Congress as we have seen is the protection of the national economy as a whole. Indeed, subsection (f) of section 7 prohibits the recipient of credit from acceptance thereof if the credit transaction is in violation of the section or the regulations prescribed thereunder.

The Court concludes that the Drasners have no implied private right of action for damages under section 7 and Regulation T promulgated thereunder.

## VI.

*The claim for rescission is legally insufficient*

■ Plaintiffs claimed a right of rescission based on Section 29 of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc.

Section 29(b) provides:

Every contract *made in violation* of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . *the performance of which* involves the violation of . . . any provision of this chapter or any rule or regulation thereunder, . shall be void . . . . (emphasis added).

This subsection only renders void those contracts which by their terms violate the

---

**14.** The point being made here is in addition to that made by Judge Friendly in his persuasive dissent in *Pearlstein I, supra*, that:

"Occasional and isolated violations of Regulation T do not threaten to cause a significant alteration in the allocation of credit in the economy; only widespread or repeated violations would pose a danger. But it is in just such situations that we may confidently expect application of the administrative and criminal sanctions provided by the Act. The economic purpose behind § 7(c) thus causes the provision to differ from those . . . directly aimed at protection of investors." 429 F.2d at 1147–48.

**502**

Act or the rules and regulations thereunder, *Billings Associates, Inc. v. Bashaw*, 276 N.Y. S.2d 446, 27 A.D.2d 124 (4th Dep't 1967); *Gregory-Massari, Inc. v. Purkitt*, 1 Cal. App.3d 968, 82 Cal.Rptr. 210 (1969); *Pearlstein v. Scudder & German*, 429 F.2d 1136, 1149 (2d Cir. 1970) (Friendly J., dissenting), *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971) for it is only such contracts which are "made in violation of," or "the performance of which involves the violation of" the statute and the rules and regulations thereunder.

Each customer's agreement between the parties herein states:

> "Every transaction is subject to . . . the rules and regulations of the . . . Board of Governors of the Federal Reserve System . . . in so far as they may be applicable."

■ Thus even if there were a violation of Regulation T in this case, the option contracts which plaintiffs seek to rescind were governed by a valid contract, *supra*, whose terms do not violate the Act or any regulations thereunder.

In addition, Section 29(b) may only be invoked by an "unwilling innocent party." *Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 469 F.2d 1166, 1182 (8th Cir. 1972). Even if these contracts were subject to that section, therefore, a new trial would still be necessary in order to determine whether plaintiffs were innocent parties, or, knowing accomplices and in violation of Regulation X.

## VII.

*There was no violation of Sec. 10(b)*

■ Plaintiffs asserted in Count Nine that defendant violated Section 10(b) of the 1934 Exchange Act and Rule 10b–5 promulgated thereunder by not disclosing that naked options were subject to margin regulations and had to be kept margined as if the options had been exercised by the holder of the options; that they were told only that the transactions must be kept in a margin account; that they had to keep only sufficient collateral in their accounts to take care of any deficiencies arising upon the exercise of the options; and that their accounts were properly margined.

These assertions are an insufficient basis to entitle plaintiffs to relief under the federal securities laws.

Plaintiffs were fully aware of the risks involved in their transactions and that their accounts would be liquidated should their collateral be less than that needed to take care of deficiencies which would arise upon the exercise of the options. It was only when there was such insufficient collateral that their accounts were liquidated.

■ In 10b–5 cases the defendant's alleged fraud must consist of improper conduct other than the mere non-disclosure of margin violations.

The plaintiffs were highly sophisticated, knowledgeable option traders, had printed business cards proclaiming themselves as option traders and were wilful participants in writing the calls. During their business relations with the defendant they attended on a daily basis at the brokerage offices where they were at all times aware of their options commitments and of the state of the market with respect to these commitments—they read the tape and had a Bunker Ramer viewer programmed to furnish instant data concerning the options they were writing. They conducted themselves in a manner disabling them from claiming "deception" such as asserted here. They may not conscionably be permitted to undo their 1975 obligations by foisting them on their agent because they proved unfavorable. They were in practical contemplation accomplices to defendant's alleged omissions and as such should not be afforded any rights under section 10(b):

> "The securities laws were not enacted to protect sophisticated businessmen from their own errors of judgment. Such investors must, if they wish to recover under federal law, investigate the information available to them with . . . care and prudence . . . ." *Hirsch v. Du Pont*, 553 F.2d 750, 763 (2d Cir. 1977).

The only effect of margin was to provide a deposit as security to the broker who was acting as plaintiffs' agent to effect a contract between plaintiffs and third parties. Margin did not increase or diminish plaintiffs' risks on the naked options they wrote. It had no financial connection with plaintiffs' gains or losses which were solely in conjunction with the price movements of the underlying stock.

■ Plaintiffs herein failed to prove that a violation of the securities laws caused any injury to them. To warrant recovery on a claim of federal fraud the plaintiff must show that the defendant's violation was a material element and a substantial factor in bringing about harm. *Piper v. Chris-Craft Industries,* 430 U.S. 1 at 51, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) (Justice Blackmum, concurring); *Meisel v. North Jersey Trust Company,* 218 F.Supp. 274, 277 (S.D.N.Y.1963) (Wyatt, J.); 5 L. Loss, Securities Regulation 3308 (2d ed. Supp.1969).

■ Neither the alleged margin violation nor any deception with respect thereto was related, calculated to or caused any injury to plaintiffs; their losses were not the proximate consequence of an absence of initial or other margin. With or without margin, the "short" sales [naked call options] would feel the impact of rising prices of stock in a volatile market.

■ Violations of Exchange rules do not take the place of scienter requirements for recovery under Section 10(b) and Rule 10b–5.

The verdict, if any can be ascribed to this Count, was clearly against the weight of the credible evidence. However, beyond this and as a matter of law, the plaintiffs herein failed to show the requisite element of deceit and plaintiffs failed to prove that the actions or omissions of the defendant caused them injury.

## VIII.

*Federal jurisdiction is lacking to support the state-created claims*

■ The common law fraud claim (Count Eleven), the New York statutory fraud claim, GBL § 352C (Count Ten), the common law conversion claim (Count Seventeen) and the counterclaim for the balance of account due defendant from plaintiffs are all pendent on the existence of federal jurisdiction herein.

■ The verdict to the extent that it connotes a factual basis of common law or state statutory deceit entitling a recovery thereon is against the weight of the credible evidence on the issues of deception, materiality, reliance and proximate damage. Since those claims might be involved in further litigation between the parties, it will suffice to say here only that the verdict is set aside for the reason stated herein.

■ The defendant's counterclaim for recovery of the deficiency in the plaintiff's accounts, after their closeout was rejected by the jury. That verdict is against the weight of the credible evidence, which was almost entirely documentary. The deficits were amply proved and the customers' agreements stipulated that the plaintiffs would pay any deficit arising in their accounts. Parenthetically, it is not a defense to a broker's claim for the balance due it from the customer, that the broker, by improperly selling out the account, converted the securities therein and is responsible for any damages caused thereby. Such a damage claim must be asserted as it was here by way of a counterclaim.

Consequently, the jury's verdict in respect to the counterclaims is set aside.

## CONCLUSION

In sum, the case is disposed of as follows:

1. The federal claims, Counts One, Three and Nine are dismissed, with costs to the defendant.

2. The state-created claims, Counts Ten, Eleven and Seventeen and defendant's counterclaims for the balance of account due defendant from plaintiffs, having no independent federal jurisdictional basis and not being pendent on any federal jurisdic-

tion of this Court are, in the exercise of discretion, dismissed, without prejudice, for want of federal jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Whatever merits may .exist therein which may warrant a trial thereof, are solely state concerns.

Judgment shall be entered accordingly. SO ORDERED.