**Mark BELL and Samuel Bell, Plaintiffs,**

v.

**J. D. WINER & CO., INC., et al., Defendants.**

**No. 73 Civ. 4802 HRT.**

United States District Court, S. D. New York.

March 5, 1975.

---

Milton S. Zeiberg, New York City, for plaintiffs.

Stroock & Stroock & Lavan by Robert P. Stein, New York City, for defendants J. D. Winer & Co., Inc. and Loeb, Rhoades & Co.

## OPINION

TYLER, District Judge.

This case is currently before the court on cross motions for summary judgment. Plaintiffs essentially allege that the court has subject matter competence over the claims raised because they arise from violations of the margin requirements (§ 7) and antifraud (§ 10) sections of the Securities Exchange Act and from violations of rules and regulations promulgated thereunder, including various rules of the New York Stock Exchange. Plaintiffs also allege a pendent state cause of action. The essence of plaintiffs' claims is that a margin purchaser can unilaterally void a margin transaction at any time if the broker does not obtain a margin agreement signed by the purchaser.

Plaintiffs apparently infer that this duty exists from their reading of the various securities laws and regulations they cite, although nowhere do they specify how or where the duty is implied in the many pages of statutes and rules to which they refer. They do allude to promoting the purposes of the Securities Exchange Act of 1934, but they do not specify to precisely what purpose they refer or how inferring a duty to obtain a signed margin agreement would promote that purpose. Since the court concludes that the duty on which the action appears to be based does not exist under federal law, it denies plaintiffs' motion for summary judgment and grants the cross-motions of defendants J. D. Winer & Co., Inc. ("Winer") and Loeb, Rhoades & Co. ("Rhoades").

Certain facts not alleged in the amended complaint might be considered to form the basis of certain claims not asserted in that complaint. Indeed, plaintiffs apparently seek to raise such claims belatedly in their affidavits and reply memorandum. In an effort to make clear the court's view of the merits of this action, the amended complaint of record will be considered to be further amended to include all facts and claims favorable to the plaintiffs which are indicated with comprehensible clarity anywhere on the record. Such claims include a contention that the initial margin requirements of Regulation T were violated and that plaintiffs were damaged as a result. But, as this opinion will demonstrate, neither this claim nor any other imaginable on the record in this case has any merit.

The essence of plaintiffs' primary claim is as follows. Mark and Samuel Bell, son and father, respectively, seek to recover the sums of $11,150.14 and $3,090.00, which sums were paid by them in connection with their purchases on margin of senior non-convertible debentures of G.A.C. Properties Credit, Inc. ("G.A.C."). They apparently base the relief requested on §§ 9(e), 18, 27, and 29 of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78i(e), 78r, 78aa, and 78cc). As indicated, the thrust of the complaint of the Bells' is that the defendants failed to obtain from plaintiffs executed margin agreements which they were legally required to do by §§ 6, 7 and 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78f, 78g, and 78j); Regulation T (12 C.F.R. § 220) and Rule 10b–5 (17 C.F.R. § 240.10b–5) promulgated thereunder; and various rules of the New York Stock Exchange. More specifically, plaintiffs' position on their motion is that, because no signed margin agreement was ever obtained from them, Winer and L. M. Rosenthal & Company, Inc. ("Rosenthal") were obligated to obtain full payment for the G.A.C. debentures within seven days of their purchase or sell the securities; that Rhoades, which succeeded Rosenthal as clearing agent for Winer in March, 1973, had no authority to sell the G.A.C. debentures following plaintiffs' failure

to maintain adequate margin in their accounts; and that therefore plaintiffs are entitled to rescission of their margin purchases of G.A.C. debentures, with concomitant restitution to them of all monies paid in connection with said purchases.

Although there are minor disputes about peripheral facts, the essential facts in this case are not contested. To the extent that there are disagreements, the facts are set out herein in the light most favorable to plaintiffs. From March, 1971, through March 5, 1973, Rosenthal acted as clearing agent for Winer, a New York corporation engaged in retailing securities. After March 5, 1973, Rhoades took over the clearing functions for Winer pursuant to an agreement reached in late January of that year. On various dates in 1971 and 1972, plaintiffs purchased G.A.C. debentures. The dates, face amounts, net amounts of these purchases, and payments made are set forth as follows:

#### MARK BELL

| Purchase or Payment Date | Face Amount | Net Amount | Payment on Transaction |
|---|---|---|---|
| Aug. 24, 1971 | $ 6,000 | $ 6,682 | |
| Sept. 3, 1971 | | | $2,000 |
| Nov. 5, 1971 | $22,000 | $24,563 | |
| by Nov. 16, 1971 | | | $1,209 |
| Nov. 17, 1971 | | | $2,160 |
| Nov. 19, 1971 | | | $4,004 |
| Nov. 17, 1971 | $ 5,000 | $ 5,175 | |
| Nov. 26, 1971 | | | $1,553 |
| | | $36,420 | $10,926 |

#### SAMUEL BELL

| Purchase or Payment Date | Face Amount | Net Amount | Payment on Transaction |
|---|---|---|---|
| Oct. 17, 1972 | $10,000 | $10,365 | |
| Oct. 25, 1972 | | | $ 3,090 |
| | | $10,365 | $ 3,090 |

It is these transactions which are the subject of this suit. Plaintiffs purchased these debentures on the condition that they would only pay a percentage of the purchase price and would pay interest at a stipulated rate on their outstanding debit balances. In short, Winer treated these purchases as margin

transactions and computed the amounts due from plaintiffs in accordance with the requirements of Regulation T as well as their own firm's margin purchase requirements. Thus, Rosenthal opened for plaintiffs what is styled a "Type 8" margin account for non-convertible debentures. Monthly statements were sent by Rosenthal to plaintiffs. These statements, of course, show the outstanding debit balances and interest charges.

In late January, 1973, Winer wrote plaintiffs that in early March, Rhoades would commence to act as Winer's clearing agent and indicated that, unless they objected, plaintiffs' accounts would be transferred from Rosenthal to Rhoades. There being no objection, the accounts were transferred. On March 5th, however, Rosenthal issued to Samuel Bell a margin call on his G.A.C. debentures. Samuel Bell declined to pay on this call.

Furthermore, between March 13 and April 9, 1973, Rhoades issued to both plaintiffs requests for additional margin and specifically warned that unless such margin was received, plaintiffs' G.A.C. debentures would be sold. These margin calls were as follows:

| DATE | TO | AMOUNT |
|---|---|---|
| March 13 | Mark Bell | $1500 |
| March 26 | Samuel Bell | $ 200 |
| March 30 | Samuel Bell | $3400 |
| March 30 | Mark Bell | $ 225 |
| April 9 | Mark Bell | $11,000 |
| April 9 | Samuel Bell | $2400 |

Except for the call on March 30 for $225 which was paid by Mark Bell, none of the requests for margin was met by the plaintiffs.

On or about April 18 and 19, 1973, Rhoades, with the consent of Winer, liquidated plaintiffs' holdings of G.A.C. debentures. As a result, Rhoades realized about $24,273 for Mark Bell, which sum when applied to his account reduced his outstanding debit balance to $819. For Samuel Bell, Rhoades realized about $6621 which sum reduced his outstanding debit balance to zero.

The pre-trial deposition of plaintiff Mark Bell establishes that he was fully aware that he was buying the G.A.C. debentures for a percentage of the purchase price and that he would pay interest on the outstanding debit balance. Plaintiffs apparently concede that Samuel Bell also understood this purchasing arrangement. There can be no reasonable doubt that plaintiffs knew they had purchased bonds which Winer was keeping as security for the loans on which the Bells were paying interest every month. Regardless of what label the Bells might apply to the transactions at issue, they understood the essential elements of those transactions for the purposes of the federal securities laws.

The moving defendants admit that they have no record of having obtained at any time a margin agreement signed by either plaintiff. It is conceded by all, however, that in March, 1973, Rhoades sent to plaintiffs its margin agreement form ("customer's agreement and consent to loan of securities"). Plaintiffs agree that they received these forms but refused to sign them, notwithstanding several written requests from Rhoades that they do so.

 I first turn to the claim that brokers are under a legal duty to obtain a signed margin agreement from each purchaser in order to effect a valid margin transaction. Plaintiffs nowhere contend that such a duty is explicitly imposed on a broker, but they do suggest that such a duty is implicit. Although plaintiffs offer no direction as to how this duty can be inferred from the securities laws and regulations which they cite, this court has analyzed those laws and regulations; it finds no basis on which such an inference could be made. To the extent that the margin requirements section of the Act of 1934 and Regulation T thereunder are intended to protect individual investors (see Pearlstein v. Scudder & German, 429 F. 2d 1136 (2d Cir. 1970), cert. denied, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971)), a duty to insure that the investor understands what a margin transaction is could be inferred. Assuming such an implied duty does exist, an individual investor might be granted standing to sue for a violation of the duty [1] since private actions might provide "a necessary supplement to Commission action." See J. I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 1560, 12 L. Ed.2d 423 (1964). However, in this case plaintiffs clearly understood at least the essential elements of the type of transaction in which they engaged through their broker. In light of this understanding, there appears to be no reason for this court to infer a duty that signed margin agreements be obtained.[2] Since the court concludes

[1]. Normally federal securities laws, including rules and regulations promulgated thereunder, are read only (1) to establish explicit, federal law standards on which private claims for relief, as well as SEC enforcement proceedings, can be based and (2) to imply that private parties have standing to sue for violations of the explicit duties which have been imposed by law in order to protect individual investors. Where a duty is not explicit, a plaintiff should have to show that implication of the duty is essential to effect the purpose of the statute under which it is inferred, as well as that private actions based on the implied duty are a necessary supplement to Commission action.

[2]. Although, as defendants surely agree, it would have been more prudent for them to have obtained written margin agreements from plaintiffs, a margin transaction or

transactions such as obviously occurred here can be established by the facts of the transaction and the intent of the parties, about which there is absolutely no mystery on this record. It has long been the rule that an agreement between a broker and customer defining the conditions of the conduct of the customer's margin account need not be in writing. "It may be implied from the surrounding circumstances or the course of dealing of the parties." See C. Myer, The Law of Stockbrokers and Stock Exchanges, § 109 (1931, updated and suppl'd in 1936). Not even the Bells contest the proposition that the margin purchases here were accomplished in conformity with their own instructions. However, another issue might be raised if an investor could prove that he did not understand the type of transaction in which he engaged or that he was fraudulently induced to engage in such a transaction.

there is no such duty, there can be no violation of that duty and, hence, no violation of the federal securities laws for not acting as if there were such a duty. Without a violation of those laws, this court lacks subject matter competence and must dismiss the plaintiffs' claims to the extent they are based on the lack of a signed margin agreement.[3]

■ Turning to § 10(b) of the 1934 Act and Rule 10b–5 thereunder, plaintiffs' claims are no more cogent, particularly in that there are no specific allegations whatsoever of any act of fraud or misrepresentation by concealment or misstatement on the part of the defendants. In short, the claims amount to no more than merely conclusory allegations that somehow the defendants' conduct was in violation of Rule 10b–5. The courts have rejected such allegations as being clearly insufficient as a matter of law. Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 444 (2d Cir. 1971).

■ Even more mystifying are plaintiffs' assertions, without specification or explanation, that the transactions at issue violated New York Stock Exchange Rules 342(b)(2), 401, 402(b), 402(d), 405(3), 406(2), 408(b), 431, and 432. To the limited extent that any of these rules seems relevant to the instant action, none appears to have been violated in any way which would support the claims asserted. Rule 402 does require a separate written authorization before a broker can lend to itself or others securities already pledged on a customer's account; however, such written authorization is nowhere required initially to pledge the securities bought for a customer's account or to sell them to satisfy the loan on which they were pledged as collateral. In fact, the failure to sell securities pledged as collateral on a margin loan, within a reasonable time after their value falls below the margin main-

tenance requirements, would itself violate Rule 431. In any case, federal courts have generally been unwilling to infer that private litigants have an implicit claim for relief and standing to sue for violation of NYSE Rules. See Colonial Realty Corp. v. Bache & Co., 358 F.2d 178 (2d Cir.), cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966); cf. Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 410 F.2d 135 (7th Cir.), cert. denied, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969). See generally Lowenfels, Implied Liabilities Based Upon Stock Exchange Rules, 66 Colum.L.Rev. 12 (1966). Aside from the considerations raised by those authorities, it is questionable whether the Federal Reserve Board has delegated rule-making authority to the NYSE, whether the Federal Reserve Board has the power to delegate its rule-making authority at all, and whether NYSE Rules are rules under the Exchange Act as required by § 27 (15 U.S.C. § 78aa) or are merely preconditions to registration of an exchange. These interesting questions are irrelevant, given this court's determination that no rule was violated in any way proximately related to plaintiffs' alleged injury; and the writer does not here imply that the violation of NYSE Rules, which have been essentially "adopted" by the Federal Reserve Board or SEC and the enforcement of which would further the purposes of the federal securities laws, would not support a federal private claim for relief.

■■ Finally, the court turns to a claim of plaintiffs which, though not plainly articulated, may be inferred from their affidavits and reply memorandum. It is this claim which is perhaps the plaintiffs' most plausible, although it is by no means strong. Plaintiffs appear to assert that their transac-

3. It might be noted here that, even if such a duty were inferred under Regulation T, plaintiffs here would have considerable difficulty proving proximate causation of their damages. Furthermore, § 7(f) and Regula-

tion X now place equal responsibility on investors to insure compliance with all requirements of § 7 and Regulation T. See discussion *infra*.

tions, or at least some of them, were in violation of the initial margin requirements of Regulation T in that their payments were several days late. There is no doubt that this circuit has held, despite a persuasive dissent by Judge Friendly, that an investor has a federal implied right of action for violations of Regulation T. Pearlstein v. Scudder & German, 429 F.2d 1136 (2d Cir. 1970), cert. denied, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971). However, the facts of that case are very different from those of the instant case. In *Pearlstein,* securities bought on margin declined in value before the initial margin requirements were complied with and while unlawful credit was being extended. In this case, the initial margin requirements were satisfied only days after they should have been and months or years before the G.A.C. debentures declined in value. Perhaps even a *de minimis* violation of Regulation T can never be cured for purposes of foreclosing enforcement actions by the SEC, but surely it can be cured for purposes of defeating a federal implied private claim

for relief. Once the initial margin requirements are met without objection, the violation can no longer be considered proximately connected with a decrease in market value in the distant future. To consider such a violation the proximate cause of an investor's loss under such circumstances would do far more to impede than to promote the purposes of the federal securities laws. It would mean that any time a broker violated the margin requirements in any way, the transaction would be voidable forever thereafter, regardless of the broker's attempts to cure the violation.[4] This principle might well inspire investors to encourage relatively insignificant infractions so that they could never lose. See Judge Friendly's dissent, Pearlstein v. Scudder & German, *supra* at 1145–49.

In addition to the preceding reasons for disallowing a private action based on violations of initial margin requirements in this case, the court notes its doubts about the continuing validity of *Pearlstein.* In that case, the Second Circuit recognized that the margin requirements were primarily [5] intended to achieve mac-

---

4. Perhaps the best solution to this dilemma would be a regulation automatically voiding any margin transaction involving an extension of credit for a longer period of time or in a greater amount than Regulation T permits. The transaction would be void *ab initio* as soon as a violation was discovered and neither party would be permitted to cure it. While it is true that such a rule would here work in plaintiffs' favor, it would undoubtedly operate against the interests of small investors frequently and with draconian results. In any case, no such regulation exists. *But cf.* 26 Fed.Res.Bull. 773 (1940). In fashioning their own solutions, the courts must be particularly astute, in implied private actions, to avoid weighting the scales so heavily in favor of either the individual investors or the brokers that the purposes of the federal securities laws are not advanced. Therefore, where it is quite possible that allowing private recovery would impede those purposes, no private action should be permitted.

5. Indeed, it is not clear from the legislative history whether Congress had any intent at all to protect individual investors or merely considered that one *effect* of margin require-

ments might be to protect such investors. See H.R.Rep. No. 1383, 73d Cong., 2d Sess. 7–9 (1934).

"The main purpose of these margin provisions in section 6 is not to increase the safety of security loans for lenders. Banks and brokers normally require sufficient collateral to make themselves safe without the help of law. *Nor is the main purpose even protection of the small speculator* by making it impossible for him to spread himself too thinly—although such a *result* will be achieved as a *byproduct* of the main purpose.

The main purpose is to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry—to prevent a recurrence of the pre-crash situation where funds which would otherwise have been available at normal interest rates for uses of local commerce, industry, and agriculture, were drained by far higher rates into security loans and the New York call market. Increasing margins—i.e., decreasing

roeconomic purposes but also recognized a consistent, subsidiary purpose to protect small investors. The court relied heavily on the fact that "the federally imposed margin requirements forbid a broker to extend undue credit but do not forbid customers from accepting such credit. This fact appears to indicate that Congress has placed the responsibility for observing margins on the broker, for the original need for margin requirements undoubtedly derived from the common desire of investors to speculate unwisely on credit." *Pearlstein, supra,* 429 F.2d at 1141. Subsequent to that case and prior to all the transactions in issue here, Congress enacted § 7(f) (1970) which apparently makes an investor equally responsible with a broker for observance of the margin requirements. Cf. Tartell v. Chelsea National Bank, 351 F.Supp. 1071 (S.D.N.Y.), aff'd, 470 F.2d 994 (2d Cir. 1972). The Federal Reserve Board promulgated Regulation X (12 C. F.R. § 224) under § 7(f), and it became effective on November 1, 1971, before all but one of the transactions at issue. Although § 7(f) and Regulation X are not aimed precisely at the instant type of situation, their existence certainly appears to undermine one of the primary supports of the *Pearlstein* rationale.

Section 7(f) was enacted primarily to promote the stability of our securities markets. See 2 U.S.Code Cong. & Admin.News, pp. 4409–4410 (1970). The primary purpose of § 7, when it was originally enacted, was similarly to promote macroeconomic stability. To the extent that various pronouncements in the legislative history of the original § 7

can be interpreted as implying that there was a secondary purpose (as opposed to an expected result) to protect small investors (even when an investor knew the margin requirements were being violated by his broker), they should be discounted to some extent as self-serving political statements and certainly should never be accorded sufficient weight that the acknowledged, primary purpose of margin requirements is disserved. In fact, the legislative history of § 7(f) indicates that:

> "Part of the reason why section 7 was originally enacted in its present form *may have been* a concern over putting the small investor at risk as to whether his broker or lender was complying with the regulations. The amendment has been carefully drawn to avoid this result. Although the Board is given clear authority to prescribe regulations applicable to borrowers, any borrower of less than $1 million would not be *criminally liable unless* he obtained credit by false representation with respect to its purpose, or acted *with actual knowledge* that the credit was in violation of the regulations." 2 U.S.Code Cong. & Admin.News, p. 4409 (1970) (emphasis added).

This statement indicates, *inter alia,* that at least the Congress which passed § 7(f) was uncertain as to whether the original § 7 was ever intended to mean what the *Pearlstein* court interpreted it to mean. In any event, this court recognizes that § 7(f) was directed primarily at imposing responsibility for compliance with the margin requirements on investors in order to control the "infusion of unregulated foreign credit into

the amounts which brokers or banks may lend for the speculative purchase and carrying of stocks—is the most direct and the most effective method of discouraging an abnormal attraction of funds into the stock market.

When margins are discussed with this main purpose in mind differences between the collateral value of gilt-edged bonds and speculative stocks, the credit-worthiness of particular borrowers and similar considerations which have been urged as rea-

sons why each loan should be treated as a particular problem in itself—*considerations which affect not a general national credit policy, but only the safety of a particular stock transaction from the standpoint of a particular lender and particular borrower—are unimportant." Id.* at 8 (emphasis added).

See generally Note, Federal Margin Requirements as a Basis for Civil Liability, 66 Colum.L.Rev. 1462 (1966).

American securities markets [which] can have a perniciously destabilizing affect on the market as a whole." 2 U.S. Code Cong. & Admin.News, p. 4409 (1970). The primary motivation for the amendment was not to impose responsibility for compliance with margin requirements on small investors using domestic money markets, but that is its effect. Similarly, there is no compelling evidence that the motivation for the original § 7 was to impose responsibility for compliance with the margin requirements exclusively on brokers and dealers, but that was its effect. Hence, while § 7(f) was probably not specifically intended to restore the *in pari delicto* defense which *Pearlstein* undermined, it must be interpreted as having had that effect to some extent.

■ From this analysis, it is evident that it is no longer justifiable for the courts to infer from § 7 that Congress intended to place exclusive responsibility for compliance on brokers and dealers. Hence, various interpretations and constructions which were formerly supported by that inference can no longer derive support from it. Thus, while § 7(f) and Regulation X may not overrule *Pearlstein*, they certainly indicate that the implied private right of action for violations of Regulation T should not be wantonly expanded. That permitting a private recovery in the instant action would constitute such a wanton expansion could be marshalled as an additional reason, if any were needed, to grant defendants' motion for summary judgment and dismissal.

■ From the conceded facts in this case, it is apparent that plaintiffs speculated for from 5 to 19 months with funds advanced by defendants Rosenthal and Rhoades, then sought to disavow their margin transactions when the market turned downward. Neither law nor equity nor common sense supports this kind of a claim. Defendants became creditors of plaintiffs, and plaintiffs cannot now avoid the consequences of their debt by relying on *de minimis* vio-

lations in which they participated and which were not proximately causative of the damages allegedly sustained.

Accordingly, plaintiffs' motion for summary judgment is denied, and the cross motion of defendants Winer and Rhoades for such relief is granted on all federal claims. The pendent state claim is, therefore, dismissed for lack of subject matter competence.

Settle order and judgment accordingly.