**ESTABLISSEMENT TOMIS, Plaintiff,**

v.

**SHEARSON HAYDEN STONE, INC., and Jeffrey Nash, Defendants,**

**Juanita E. Spiegel and Stanley Spiegel, Additional Defendants on Counterclaim.**

**No. 76 Civ. 5675 (HFW).**

United States District Court, S. D. New York.

Nov. 8, 1978.

Gusrae, Greene & Kaplan, New York City, for plaintiff Establissement Tomis.

Willkie, Farr & Gallagher, New York City, by Michael B. Targoff, Thomas C. O'Keefe and New York City, Gerald Kerner, for defendants Shearson Hayden Stone, Inc. and Jeffrey Nash.

Chadbourne, Parke, Whiteside & Wolff, New York City, by Chester J. Hinshaw, Terry A. Thompson, New York City, of counsel, for additional defendants Juanita E. Spiegel and Stanley Spiegel.

## MEMORANDUM DECISION

WERKER, District Judge.

Plaintiff Establissement Tomis ("Tomis"), a Liechtenstein corporation, commenced this action charging defendants, securities brokerage firm Shearson Hayden Stone, Inc. ("Shearson") and its registered representative Jeffrey Nash ("Nash") with violations of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rules 10b–5 and 10b–16 promulgated thereunder, 17 C.F.R. 240.10b–5 and 10b–16; section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); section 7(c) of the Exchange Act, 15 U.S.C. § 78g(c), and Regulation T promulgated

thereunder by the Federal Reserve Board, 12 C.F.R. 220.1 *et seq.;* and New York Stock Exchange Rules 431 and 432 in connection with the operations of Tomis' margin account with Shearson.[1] Each cause of action seeks $185,007.88 in damages; Tomis also requests $100,000 in punitive damages. Shearson counterclaimed against Tomis for the debit balance of its account, $96,308.30. Stanley and Juanita Spiegel were added as additional defendants by Shearson on the counterclaim. Stanley Spiegel is apparently the president and general agent of Tomis and executed the option agreement and customer's agreement with Shearson on Tomis' behalf. Juanita Spiegel, his wife, is the owner of Tomis.

Shearson, contending that as a matter of law Tomis possesses no cause of action arising out of margin violations, moves for judgment on the pleadings; the Spiegels move for summary judgment or alternatively for dismissal of the counterclaim against them. Both motions will be determined in this opinion.

The pertinent facts, briefly stated, are as follows. In November of 1973 Tomis opened its account with Shearson and traded in the purchase and sale of options on margin until April of 1975 when Tomis had a short position in the securities of Bur-roughs Corporation and the Digital Equipment Corporation. It is disputed whether Shearson issued a margin call at this point. Eventually, since the margin deficit was not met, Shearson liquidated the Tomis account and was left with the $96,308.30 debit balance which it presently seeks to recover.

## The Motions of Shearson and Nash

### I. Second Cause of Action [2]

■ Tomis' second cause of action alleges violations of section 7(c) of the Exchange Act [3] and Regulation T [4] promulgated thereunder. Tomis claims that defendants' failure to satisfy margin requirements along with the failure to notify Tomis of the status of its account resulted in numerous trading transactions causing financial loss that would not have occurred otherwise. Defendants respond that section 7 and Regulation T do not support a private right of action.

The starting point is the Second Circuit's decision in *Pearlstein v. Scudder & German,* 429 F.2d 1136 (2d Cir. 1970), *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971) (*"Pearlstein I"*) where the court found an implied right of action under section 7 and Regulation T in favor of a customer against a broker for violations of margin requirements. The court stated

---

1. A margin account is one that allows an investor to buy securities on credit provided that at all times he keeps a certain amount of equity in the account. *Klein v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* [Current] Fed.Sec.L. Rep. (CCH) ¶ 96,523 at 94,052 n.2 (E.D.N.Y. 1978).

2. Each cause of action will be addressed in the order used by Shearson in its memorandum of law. Hence the first cause of action will be discussed out of sequence.

3. Section 7(c) provides as follows:
   (c) It shall be unlawful for any member of a national securities exchange or any broker or dealer, directly or indirectly, to extend or maintain credit or arrange for the extension or maintenance of credit to or for any customer—
   (1) On any security (other than an exempted security), in contravention of the rules and regulations which the Board of Governors of the Federal Reserve System shall prescribe under subsections (a) and (b) of this section;
   (2) Without collateral or on any collateral other than securities, except in accordance with such rules and regulations as the Board of Governors of the Federal Reserve System may prescribe (A) to permit under specified conditions and for a limited period any such member, broker, or dealer to maintain a credit initially extended in conformity with the rules and regulations of the Board of Governors of the Federal Reserve System, and (B) to permit the extension or maintenance of credit in cases where the extension or maintenance of credit is not for the purpose of purchasing or carrying securities or of evading or circumventing the provisions of paragraph (1) of this subsection.

4. Regulation T governs the extension of credit by brokers and dealers by prescribing minimum margin requirements. The companion regulation to Regulation T is Regulation U dealing with bank financing rather than broker/dealer financing.

that although the legislative history of section 7 indicated that "protection of individual investors was a purpose only incidental to the protection of the overall economy from excessive speculations," *id.* at 1140, nevertheless private suits by investors serve as "a highly effective means of protecting the economy as a whole from margin violations by brokers and dealers." *Id.* Judge Friendly dissented, voting to deny recovery based upon an implied right of action. Subsequent to *"Pearlstein I"* section 7(f)[5] of the Exchange Act was enacted in 1970 and implemented by Regulation X, 12 C.F.R. § 224, *et seq.*[6] Section 7(f) makes it unlawful for *any person* to receive, obtain or enjoy any illegal extension of credit, thereby placing a duty upon the investor himself to comply with margin requirements. As noted recently in *Nussbacher v. Chase Manhattan Bank,* [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,254 at 92,692 (S.D.N.Y.1977), *rev'd on rehearing,* 444 F.Supp. 973 (S.D.N.Y.1978), no such customer accountability existed when *"Pearlstein I"* was decided. Rather, at that time only the broker was liable for a section 7 violation. And, as noted in *Schy v. FDIC,* [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,242 (E.D.N.Y.1977), *appeal pending,* the amendment to section 7 "prompted widespread reanalysis of *Pearlstein I* principles" even within the Second Circuit itself. *Id.* at 92,629. Thus in *Pearlstein v. Scudder & German,* 527 F.2d 1141 (2d Cir. 1975) (*"Pearlstein II"*) the court recognized that the enactment of section 7(f) and the promulgation of Regulation X "cast doubt on the continued viability of the rationale of our prior holding." 527 F.2d at 1145 n.3 (2d Cir. 1975) (citation omitted).

Cases subsequent to *"Pearlstein I and II"* have incorporated the analysis of *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), in determining whether an implied cause of action exists under section 7. *See, e. g., Nussbacher v. Chase Manhattan Bank, supra; Schy v. FDIC, supra; Drasner v. Thomson McKinnon Securities, Inc.,* 433 F.Supp. 485, 498–501 (S.D.N.Y.1977); *Theoharous v. Bache & Co.,* [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,281 (D.Conn.1977); *Stern v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 96,528 (D.Ma.1978). Specifically, the *Cort v. Ash* criteria applied in these cases has been:

"First, is the plaintiff 'one of the class for those *especial* benefit the statute was enacted.' . . . that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?"

422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted). Upon consideration of these factors the above courts have determined that

---

**5.** Section 7(f) provides in part:

(1) It is unlawful for any United States person, or any foreign person controlled by a United States person or acting on behalf of or in conjunction with such person, to obtain, receive, or enjoy the beneficial use of a loan or other extension or credit from any lender (without regard to whether the lender's office or place of business is in a State or the transaction occurred in whole or in part within a State) for the purpose of (A) purchasing or carrying United States securities, or (B) purchasing or carrying within the United States of any other securities, if, under this section or rules and regulations prescribed thereunder, the loan or other credit transaction is prohibited or would be prohibited if it had been made or the transaction had otherwise occurred in a lender's office or other place of business in a State.

＊ ＊ ＊ ＊ ＊ ＊

(3) The Board of Governors of the Federal Reserve System may, in its discretion and with due regard for the purposes of this section, by rule or regulation exempt any class of United States persons or foreign persons controlled by a United States person from the application of this subsection.

**6.** Regulation X prohibits the receipt of credit by any person when the extension of such credit would cause the creditor to violate either Regulation T or U. *See* note 4 *supra.*

the time has come to part with the *Pearlstein* rationale.

Turning to the first of the *Cort* factors, there is no dispute that the investor is merely an incidental beneficiary of section 7 rather than one for whose "especial benefit" the section was enacted. Such a position was even voiced by the *"Pearlstein I"* court where it noted that legislative history shows that protection of the economy from excessive speculation rather than protection of investors is the main purpose of section 7. 429 F.2d at 1140, *citing* Report of the House Committee on Interstate & Foreign Commerce, H.R. Rep. No. 1383, 73d Cong., 2d Sess. 8 (1934). Legislative history is, however, neutral as to the second *Cort* factor, and both the *Schy* and *Theoharous* courts have expressly interpreted congressional silence concerning the creation of a remedy as an implied denial of a private cause of action. *Schy*, ¶ 96,242 at 92,630; *Theoharous*, ¶ 96,281 at 92,802. In so doing, Chief Judge Mishler noted in *Schy* that the statutory scheme, including Federal Reserve Board regulation and SEC enforcement through administrative and penal sanctions, provided a means of "public oversight" of margin violations. Accord, *Drasner v. Thomson McKinnon Securities, Inc.*, 433 F.Supp. at 501. As to the third *Cort* factor, there appears to be sufficient reason to find the implication of a private remedy inconsistent with the legislative scheme since it is the whole scale economy rather than the investor that section 7 and Regulation T seek to protect. A private right of action would undoubtedly benefit the individual investor but it would leave the overall economic system unaffected. *See Theoharous*, ¶ 96,281 at 92,802. As the *Schy*, *Drasner* and *Stern* courts aptly pointed out, a private right of action may foster margin violations by encouraging an investor to consent to violations and avoid SEC enforcement proceedings if financial success results while providing him with a "fall back" position in the form of a suit against the broker when he loses. *See also "Pearlstein I,"* 429 F.2d at 1148–49 (Friendly, J., dissenting).[7] This, coupled with the investor's status as only an incidental beneficiary of section 7 and Regulation T, leads this court to agree with those who have concluded that a private right of action is not a "necessary supplement" to administrative enforcement of margin restrictions. *See Piper v. Chris-Craft*, 430 U.S. 1, 25, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) (Court noted that where there is congressional silence as to remedies under the Exchange Act, a private right of action may be implied for a particular class whom the statute seeks to protect where congressional purposes would be undermined without private enforcement). In so concluding I decline to follow those cases in this circuit which continue to recognize the *Pearlstein* holding as a viable one. *See, e. g., Palmer v. Thomson & McKinnon Auchincloss, Inc.*, 427 F.Supp. 915 (D.Conn. 1977); *Evans v. Kerbs*, 411 F.Supp. 616 (S.D.N.Y.1976); *Newman v. Pershing & Co.*, 412 F.Supp. 463 (S.D.N.Y.1975). The second cause of action is dismissed accordingly.

## II. *Third Cause of Action*

■ Tomis' third cause of action alleges a violation of New York Stock Exchange Rule 431 which stipulates the minimum amounts of equity that must be maintained in a margin account at a given time. Tomis contends that on numerous occasions its account was maintained below the proper margin amounts, that defendants failed to notify it that Rule 431's margin requirements were not met, and that Tomis would

---

7. Judge Friendly stated:

Even assuming that the purpose of § 7(c) would be served by a degree of private enforcement, I question whether the majority's free-wheeling approach will have the desired effect. As a result of it, speculators will be in a position to place all the risk of market fluctuations on their brokers, if only the customer's persuasion or the broker's negligence causes the latter to fail in carrying out Regulation T to the letter. Any deterrent effect of threatened liability on the broker may well be more than offset by the inducement to violations inherent in the prospect of a free ride for the customer who, under the majority's view, is placed in the enviable position of "heads-I-win tails-you-lose."

429 F.2d at 1148 (footnote omitted).

not have entered into subsequent account transactions had defendants apprised it of these facts.

Margin maintenance requirements were not promulgated to protect investors but rather to ensure broker solvency by requiring sufficient collateral for the loans used to finance customers' transactions. *Carras v. Burns*, 516 F.2d 251, 260 (4th Cir. 1975) (since protection of investors not main purpose of rule, broker may be disciplined for violation of margin rules, but customer liability arises only when violation operates to defraud). As such Rule 431 creates no cause of action, *id.*, and therefore the third cause of action is dismissed.

### III. *First Cause of Action*

Tomis alleges that defendants violated section 17(a) of the Securities Act of 1933, section 10(b) of the Exchange Act, and Rules 10b–5 and 10b–16 by failing to meet margin requirements established by section 7, Regulation T and New York Stock Exchange Rules 431[8] and 432.[9]

■ Before addressing Tomis' contentions in detail, the court notes that section 17(a) does not furnish a private cause of action for damages in this circuit. *Architectural League of New York v. Bartos*, 404 F.Supp. 304, 313 (S.D.N.Y.1975); *Welch Foods, Inc. v. Goldman Sachs & Co.*, 398 F.Supp. 1393, 1399–1401 (S.D.N.Y.1974); *Schlansky v. United Merchants & Manufacturers, Inc.*, 443 F.Supp. 1054, 1060 (S.D.N.Y.1977); *Scarfarotti v. Bache & Co.*, 438 F.Supp. 199, 207 (S.D.N.Y.1977); *Allegaert v. Perot*, [Current] 78 F.R.D. 427 (S.D.N.Y. 1978). Similarly, Tomis has cited no case (and the court is aware of none) holding that a plaintiff may possess a private right of action for damages under Rule 10b–16. Therefore the first claim will only be treated from a section 10(b) and Rule 10b–5 standpoint.

**8.** See discussion *supra* dealing with the third cause of action.

**9.** Rule 432 requires brokers to maintain daily records concerning margin accounts where additional margin is required due to transactions

The first cause of action contains boilerplate language to the effect that, through instrumentalities of transportation and communication in interstate commerce, schemes and artifices to defraud were employed in connection with the offer, sale and purchase of securities. Additionally, the complaint in relevant portion charges that defendants:

(a) Intentionally misrepresented to the Plaintiff the worth of its account in failing to inform the Plaintiff that the securities and cash worth of its account was insufficient to satisfy the margin requirements pursuant to the Exchange Act and Regulation T promulgated thereunder by the Federal Reserve Board.

(b) Failed to maintain proper books and records in relation to Plaintiff's account.

(c) Intentionally failed to notify the Plaintiff that its account was under margin requirements as per the Exchange Act and Regulation T promulgated thereunder by the Federal Reserve Board.

(d) Intentionally omitted to state to the Plaintiff or its agent that the Defendants were violating New York Stock Exchange Rules and Regulations, in particular, Rule 431 and 432, of the Rules of the New York Stock Exchange, in that the Defendants intentionally failed to:

(i) properly margin Plaintiff's account;

(ii) properly complete Plaintiff's Special Miscellaneous Account and margin requirements;

(iii) notify Plaintiff of its undermargined status;

(iv) comply with Rule 432 by allowing the margin requirements in Plaintiff's account to be met by liquidation in violation of Rule 432;

(v) comply with Rule 432 by permitting and allowing, without a proper basis, requests to be made to the New York Stock Exchange for extensions of time to com-

effected on that day. The rule further requires the record to reflect, as to each account, the amount of margin required and the time and manner in which the margin is obtained.

ply with the maintenance and margin requirements of the New York Stock Exchange and Regulation T of the Federal Reserve Board, respectively;

(vi) properly meet the maintenance requirements of Rule 431 of the New York Stock Exchange Rules and Regulations.

(e) Intentionally failed to satisfy the margin requirements by liquidating the security positions held in Plaintiff's account as required by the Exchange Act.

Complaint at 4 & 5.

Defendants attack the first cause of action on the ground that since section 7, Regulation T, and Rule 431 do not give rise to a private cause of action for margin violations, there cannot be a securities fraud claim arising out of the same conduct. They cite *Drasner v. Thomson McKinnon Securities, Inc., supra*; *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442 (2d Cir. 1971); *Bell v. J. D. Winer & Co.*, 392 F.Supp. 646 (S.D.N.Y.1975); *Utah State University v. Bear, Stearns & Co.*, 549 F.2d 164 (10th Cir.), *cert. denied*, 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977); and *Carras v. Burns, supra*, as supportive authority. Those cases, however, do not support the proposition that conduct giving rise to margin violations can *never* provide the basis of a securities fraud claim.

In *Drasner* Judge Pollack was presented with claims that the defendant had committed securities fraud by not disclosing to plaintiffs that naked options had to be kept properly margined pursuant to section 7 and Regulation T; by only informing plaintiffs that their transactions had to be kept in a margin account and that they had to maintain sufficient collateral to cover deficiencies arising out of the exercise of options ˙without more; and by informing plaintiffs that their accounts were properly margined. After trial rather than upon consideration of a motion to dismiss, the court determined that such claims would not entitle plaintiffs to relief under the securities laws. Judge Pollack stated that "[i]n 10b–5 cases the defendant's alleged fraud must consist of improper conduct other than the mere nondisclosure of margin

violations." 433 F.Supp. at 502. He further found that the plaintiffs were "highly sophisticated, knowledgeable option traders," *id.*, and determined that the alleged margin violations were not the proximate cause of plaintiffs' injury. 433 F.Supp. at 503. The *Drasner* court did not hold, as defendants urge, that there could never be a set of circumstances where margin violations would constitute a fraud. *Cf. Stern v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 96,-528 at 94,090 (D.Ma.1978) (on defendant's motion court dismissed count alleging section 7 and Regulation T violations but sustained balance of complaint relying in part on margin violations since it was not clear that plaintiff could prove no set of facts thereunder entitling him to relief). In *Shemtob, supra*, the Second Circuit did reject a cause of action pleaded under section 10(b) for violations of a margin agreement. The reason for so doing, however, was that the claim failed to allege facts constituting scienter, 448 F.2d at 445, a necessary element of a securities fraud claim. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Rolf v. Blyth Eastman Dillon & Co.*, 570 F.2d 38, 44–47 (2d Cir. 1978). Judge Tyler rejected the claims in *Bell v. J. D. Winer & Co., supra*, for the same reason, 392 F.Supp. at 651, as did the court in *Utah State University v. Bear, Stearns & Co.*, 549 F.2d at 169. Likewise, the court in *Carras v. Burns, supra*, rejected violations of Rule 431 as constituting violations of the Exchange Act. It found that under the proof adduced at trial the violations were only contractual breaches that did not operate as a fraud upon the customer. 516 F.2d at 260.

Recently Judge Bramwell was presented with a motion to dismiss in *Klein v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 96,523 (E.D.N.Y.1978), an action involving losses sustained on investments in call options. There the court did not reach the question of whether an implied right of action exists under section 7 because it found that the margin violations formed part of a fraud claim which was properly pleaded. *See*

¶ 96,523 at 94,056 n.7. The plaintiffs alleged that defendant's registered representative had intentionally misrepresented anticipated profits, and the manner and terms of payment by the customers to induce them to invest. Further, during the purchase of certain options, the broker issued written confirmations for amounts less than those ordered and verbally confirmed, and he mishandled checks in an effort to obtain a false basis to liquidate plaintiffs' accounts at manipulative prices. The liquidations allegedly occurred in non-arms length transactions involving persons associated with defendant and at prices below those prevailing on the market. The court determined that the complaint stated facts amounting to scienter which met the requirements of *Shemtob v. Shearson, Hammill & Co.*, *supra*, since the claim was based neither solely upon defendant's failure to promptly liquidate the margin accounts after the market value declined in the plaintiff's collateral in the portfolio, nor negligent management of the portfolio. ¶ 96,523 at 94,054. Additionally, the requisites of Fed.R.Civ.P. 9(b) were met, because the manner of fraudulent inducement was properly described, specific misrepresentations were identified, and the dates, amounts and nature of the subject securities, along with the offending transactions, were set forth. The relationship between the misleading representations and later fraudulent acts of defendant was also pleaded. ¶ 96,523 at 94,055.

A comparison of the content of the instant complaint with that of the *Klein* complaint quickly reveals that the former cannot withstand defendants' motion to dismiss. Although Tomis claims that defendants intentionally misrepresented the worth of the Tomis account, this is supported only by conclusory statements that defendants failed to inform plaintiff of margin violations, to maintain proper records, and to margin the account properly, thus violating section 7, Regulation T and Rules 431 and 432. Tomis argues in its memorandum of law that the first cause of action should not be dismissed because it alleges more than non-disclosure of margin violations found not to afford a basis for relief under *Dras-*

*ner, supra.* It states that "[t]he heart of Plaintiff's case is that the Defendants engaged in a fraudulent course of conduct including: knowing misrepresentation of the Plaintiff's margin balance and purchasing power so that the Defendants would share increased commission; encouraging heavy trading of listed options; intentionally disregarded the doctrines of suitability; made material, intentional misrepresentations by commission and omission to keep the Plaintiff's account active." Pl. mem. at 4. The problem with this summary of the case is that it is simply not borne out in the insufficiently pleaded complaint. And, although plaintiff urges that its case requires further development at trial, the court will first require further development and particularization of the alleged fraud in the complaint pursuant to the standards enunciated in the *Klein* case, *supra*, and the authorities cited therein.

Accordingly, the first cause of action is dismissed with leave to replead in conformity with the above within twenty days from entry of this decision.

## IV. *Fourth Cause of Action*

Tomis alleges that defendants' actions were intentional and were committed with knowledge and in disregard of its interests. Consequently $100,000 in punitive damages is sought. Section 28(a) of the Exchange Act, 15 U.S.C. § 78bb(a), limits recovery to "actual damages" and thus precludes punitive damages. *Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303, 1313 (2d Cir. 1977); *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1283–87 (2d Cir. 1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); *Green v. Wolf Corp.*, 406 F.2d 291, 302–03 (2d Cir. 1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). The fourth cause of action is dismissed accordingly.

## The Spiegel Motions

Stanley and Juanita Spiegel move to dismiss Shearson's counterclaim against them on grounds that the court lacks subject

matter jurisdiction; alternatively, they seek summary judgment. As noted above, Shearson's first counterclaim is asserted against Tomis for the $96,308.30 debit balance in its account.[10] Shearson's second counterclaim is interposed against the Spiegels for the same amount on the theory that they are the alter egos of Tomis. Shearson alleges that Tomis has never had a separate corporate existence but has existed solely for the Spiegels' transaction of their individual business under a corporate guise.

■ The initial question is whether Shearson's counterclaim against the Spiegels is compulsory or permissive under Fed. R.Civ.P. 13. If under Rule 13(a)[11] the counterclaim is compulsory, it is within the ancillary jurisdiction of the district court and no independent basis of federal jurisdiction is required. *Harris v. Steinem*, 571 F.2d 119, 121 (2d Cir. 1978); *Newburger, Loeb & Co., Inc. v. Gross*, 563 F.2d 1057, 1070 (2d Cir. 1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); *United States v. Heyward-Robinson Co.*, 430 F.2d 1077, 1081 (2d Cir. 1970), *cert. denied*, 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971). *See generally* 6 C. Wright & A. Miller, Federal Practice and Procedure § 1414 (1971 ed.). If however, the counterclaim is permissive in nature under Rule 13(b),[12] an independent basis of federal jurisdiction must exist before the court may address the merits of Shearson's claim. *Harris v. Steinem*, 571 F.2d at 122; *Newburger, Loeb & Co., Inc. v. Gross*, 563 F.2d at 1070–71; *United States v. Heyward-Robinson Co.*, 430 F.2d at 1080. In the present case there is no dispute that both Shearson and the Spiegels are citizens of New York, and hence there is no federal jurisdiction over the counterclaim based upon diversity of citizenship and the requisite amount in controversy under 28 U.S.C. § 1332. No alternative basis of jurisdiction is suggested by the parties. Thus, the court may exercise jurisdiction over Shearson's counterclaim only if it is compulsory.

■ Rule 13(a) in pertinent part defines a compulsory counterclaim as one that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . ." In interpreting this rule the Second Circuit has adopted the "logical relation" test, *Newburger, Loeb & Co. v. Gross*, 563 F.2d at 1071, which requires only a logical relationship between the main claim and the counterclaim rather than absolute identity of fact backgrounds between the two claims. *United Artists Corp. v. Masterpiece Productions*, 221 F.2d 213, 216 (2d Cir. 1955). This approach "attempts to analyze whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit," *Harris v. Steinem*, 571 F.2d at 123, and "precise identity of issues and evidence between claim and counterclaim is not required." *Id.*, citing *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610, 46 S.Ct. 367, 70 L.Ed. 750 (1926). *See* 6 C. Wright and A. Miller, *supra*, at § 1410.

■ An application of the above standards to Shearson's counterclaim against

---

**10.** Tomis has not moved to dismiss the first counterclaim.

**11.** Rule 13(a) provides:

Compulsory Counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction. But the pleader need not state the claim if (1) at the time the action was commenced the claim was the subject of another pending action, or (2) the opposing party brought suit upon his claim by attachment or other process by which the court did not acquire jurisdiction to render a personal judgment on that claim, and the pleader is not stating any counterclaim under this Rule 13.

**12.** Rule 13(b) states:

Permissive Counterclaims. A pleading may state as a counterclaim any claim against an opposing party not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim.

the Spiegels reveals that the counterclaim is compulsory rather than permissive. Shearson contends, for reasons discussed below, that the Spiegels "are" Tomis on an alter ego theory. Tomis' allegations in the complaint and Shearson's counterclaims against both Tomis and the Spiegels arise from the same set of operative facts, that is, the securities transactions executed on margin in the Tomis account at Shearson. Both the main claims and the counterclaims revolve around the loss of funds due to the trading. Tomis alleges that Shearson owes it money for failure to exercise proper control over the margin trades; Shearson counters that Tomis and the Spiegels traded on Shearson's extension of credit and refused to pay the debit balance owing in the Tomis account. In a case such as this the facts surrounding the potential liability of the respective parties are inextricably intertwined, and the subsidiary issue of whether the Spiegels are in fact Tomis' alter egos does not weaken that circumstance. In short, the court is satisfied that the counterclaim in issue is "closely related to the subject matter of the opposing party's claim, [and that] common sense and judicial economy compel the conclusion that such claims should be tried together . . . ." *Newburger, Loeb & Co., Inc. v. Gross*, 563 F.2d at 1071. Accordingly, jurisdiction will be exercised over the counterclaim against the Spiegels.

■ The next issue is whether the Spiegels are entitled to summary judgment on the counterclaim. They argue that as a matter of law there is no basis for piercing the corporate veil of Tomis and holding them liable for the corporation's debit balance allegedly due Shearson. In support of their motion, the Spiegels submitted an affidavit from their attorney reciting various facts about the Spiegels, Tomis, its corporate structure, and its relationship with Shearson during the relevant time period. The attorney's affidavit is procedurally deficient, however, since Rule 56(e) clearly requires that supporting affidavits be executed on personal knowledge and set forth facts that would be admissible in evidence. *Christophides v. Porco*, 289 F.Supp. 403, 407

(S.D.N.Y.1968). Even placing this deficiency aside though, material issues of fact exist that preclude a finding that as a matter of law the Spiegels are not liable for Tomis' alleged debt.

■ In determining whether the Spiegels are Tomis' alter egos, numerous factors must be evaluated by the court. They include gross undercapitalization of the subject corporation, disregard of corporate formalities, corporate insolvency at the time in question, lack of corporate records, non-payment of dividends, siphoning of corporate funds by the dominant shareholder, non-function of directors and officers, and an inquiry as to whether the stockholders used the corporation merely as a facade for their own operations. *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 685–87 (4th Cir. 1976). *See also* 1 Fletcher, Cyc. Corp. § 41.1 (Perm. ed.). Courts will pierce the corporate veil reluctantly due to a presumption of corporate regularity, *Pardo v. Wilson Line of Washington, Inc.*, 134 U.S.App.D.C. 249, 253–254, 414 F.2d 1145, 1149–50 (1969), and the party contending that the corporate entity should be disregarded carries the burden of establishing a basis for so doing. *Id.*; *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d at 683.

■ Discovery has unfolded facts relevant to the above standards concerning Tomis' corporate status from which this court must draw reasonable inferences against the Spiegels and in favor of Shearson as the party opposing summary judgment. *FLLI Moretti Cereali v. Continental Grain Co.*, 563 F.2d 563, 565 (2d Cir. 1977). For example, several monetary transfers from Tomis' accounts with brokers to the Spiegels occurred. Those transfers have not been satisfactorily verified as repayments of loans made by the Spiegels or by Mrs. Spiegel alone to the corporation. There are also other indicia of possible commingling of corporate and personal funds by the Spiegels. A $4,407.90 payment by Tomis for the Spiegels' round trip passage by vessel to Europe has not been sufficient-

ly verified as payment for a business trip taken for Tomis. Another Tomis disbursement in the sum of $4,786.59 for art work has also not been adequately explained as a Tomis business expense or repayment of a loan to the Spiegels. Concerning this matter, Mrs. Spiegel testified during her deposition that the corporation "owed us money or something like that." Tr. 48. Further testimony of Mr. Spiegel at deposition indicates that corporate formalities as to Tomis may have been ignored. Apparently Tomis kept few or no formal books and records, choosing instead merely to compile bank statements, memoranda, credit and debit vouchers, etc. which were later transferred to Tomis' accountant's work sheets. Tr. 532–33. Additionally, Mr. Spiegel testified that Tomis has never paid dividends to its shareholder, Mrs. Spiegel. Tr. 515. Other questionable factors have also been raised by Shearson and stand uncontradicted by the Spiegels. To enumerate each one here, however, serves no purpose since the court's function in deciding a summary judgment motion is not to try factual issues but rather to determine whether material issues of fact exist to be tried. *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975). Having determined that material issues of fact do exist as to whether the Spiegels were the alter egos of Tomis, the court concludes its inquiry; the issue must await a trial by the fact finder. The Spiegels' motion for summary judgment on the counterclaim is therefore denied.[13]

In accordance with the above, defendants' motion for judgment on the pleadings is granted to the extent that the complaint is dismissed; plaintiff is granted twenty days leave to replead the first cause of action. The Spiegels' motion for summary judgment or dismissal on the second counterclaim is denied.

SO ORDERED.

---

13. The Spiegels contend that even if Shearson is able to pierce Tomis' corporate veil on an alter ego theory, only Mrs. Spiegel would be personally liable since she is the sole stockholder of the corporation. They argue that since Mr. Spiegel is not an owner, there is no basis for a claim against him on an alter ego theory. The issue of Mr. Spiegel's potential liability will not be determined at this juncture, however, since the question has been insufficiently briefed by the parties. Neither Shearson nor the Spiegels has cited any authority indicating that Mr. Spiegel as a non-shareholder can or cannot be held personally liable on an alter ego theory, and the court's own research has revealed no determinative case holding on the subject. Nevertheless, several basic concepts in this area of the law are clear. As the *DeWitt* court stated, "in applying the 'instrumentality' or 'alter ego' doctrine, *the courts are concerned with reality and not form*, with how the corpo- ration operated and the individual defendant's relationship to that operation." 540 F.2d at 685 (emphasis supplied). In the present case, should Mr. Spiegel appear to be the real and controlling party in interest despite Mrs. Spiegel's ownership of 100 percent of the corporation's stock, the court could exercise its equitable powers and impose a constructive trust on part or all of her shares. The same would hold true should it appear that Mr. Spiegel used Tomis and Mrs. Spiegel's status as sole shareholder to cover any fraud, or illegality, or to avoid his own personal obligations. While the court expresses no view as to what Mr. Spiegel's ultimate liability, if any, will be in this suit, it declines to find that under no set of circumstances can he be shown to be an alter ego of Tomis simply because 100 percent of Tomis' stock is held in his wife's name instead of his. *See generally* Fletcher, Cyc. Corp. §§ 41–41.3 (Perm. ed. & 1977 Supp.).